UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6088 CR - UNGARO-BENAGES

UNITED STATES OF AMERICA,

      Plaintiff

vs.

MARCA MINUTO a/k/a "The Big Guy";
NICOLO MARIANI; JOSEPH MINUTO;
MARCELLO GRASSO a/k/a "J.J.";
ALEX TORRENTE a/k/a "Porky" a/k/a "Neck";
CHRIS GRECO, JULIO PEREZ, ANGEL
HERNANDEX, and a/k/a "Junior JORGE
RAVELO,

      Defendants.

_____/



## <u>MOTION FOR REVOCATION OF PRETRIAL DETENTION ORDER</u>

NICOLO MARIANI ("Mariani"), through undersigned counsel pursuant to 18 U.S.C. §

3145 moves this Court for an order revoking the Pretrial Detention Order issued by this Court on

July 18, 2000. As grounds Mariani states the following:

    1.     Trial in the above styled case is scheduled for February 2001.

    2.     That Defendant, Mariani is the only Defendant in the above styled case who is

being detained pursuant to a pretrial detention order. All seven co-defendants have been released

on bond.

    3.     That Mariani's pretrial detention order was executed on July 18, 2000 and

followed a July 17, 2000 detention hearing.  A copy of the detention order and the detention

hearing are attached to this application as Exhibits "A" and "B".

1



4.    That the Magistrate-Judge determined that the Government failed to establish that Mariani was a risk of flight.

> After having been on the bench for nine years I have come to one conclusion, not everyone is all good or all bad. Everyone has certain facets of each in their life. The Court doesn't find that this Defendant presents a risk of flight.
>
> **July 17, 2000 Hearing at Pg. 54**.

5.    That the Magistrate-Judge determined that the Government had established that Mariani was a danger to the community.

> However, the Court is concerned and does find that he represents a threat of danger in the community, and that finding is based upon an examination of Mr. Mariani's record. In 1989 he was convicted, among other things, of resisting an officer without violence and served two months in jail.
>
> In 1990 we have heard much about the arson conviction, and he was sentenced to 46 months confinement. Thereafter in 1995 he was charged with and convicted of aggravated battery, hit and run and served two years and four months in confinement.
>
> Subsequently he was charged with a supervised release violation, among which involved claiming that he posed as an FBI agent.
>
> All of these factors lead me to conclude, and I do conclude, that he represents a risk of danger in the community.
>
> **July 17, 2000 Hearing at Pg. 54**.

6.    That the Magistrate-Judge set forth the following findings in reaching its conclusion that Mariani was a danger to the community:

2

4.     The defendant has a long history of violent acts, some of which were committed while on supervised release. These criminal acts include, inter alia,:

(a) Arson, for which the defendant was sentenced to serve 46 months incarceration and three years of supervised release (May 17, 1990);

(b) Aggravated battery, committed while the defendant was on supervised release for Arson, and for which the defendant was sentenced to over two years confinement (August 14, 1995);

(c) Impersonating an FBI agent and attempting to gain entrance to a residence for which the defendant was not convicted but which did constitute one of many violations of the defendant's supervised release (See Report and Recommendation United States v. Maraiani, Case No. 95-8008, Dated January 27, 1997; Govt Ex. 6.)

**July 18, 2000 Pretrial Detention Order at Pg. 3**

7.     That Mariani respectfully submits that the Government attempted to portray Mariani in a misleading and exaggerated manner which caused the Magistrate-Judge to inaccurately conclude that Mariani was a danger to the community.

8.     That Mariani was the victim of a "throw as much as possible against the wall and hope that it sticks" presentation at his Pretrial Detention Hearing in which a cloud of innuendo was cast upon the issue of "danger to the community".

9.     That when the Government's hearing deluge is placed into its proper context and the information is fully evaluated, Mariani's past does not provide the basis for a finding of danger to the community.

3

10.    That Mariani respectfully submits that the Magistrate-Judge's determinations were erroneous and that in fact there are conditions of release including electronic monitoring that will reasonably assure the safety of other persons and the community.

11.    That in particular the Magistrate-Judge placed a disproportionate weight on Mariani's previous criminal record and did not fully consider circumstances relating to Mariani at the time of the bond hearing.

12.    That the logical consequence of the Magistrate-Judge's determination is that Mariani would be pretrial detained even if he were charged with the most trivial of cases. In effect, Mariani's past record would preclude his release no matter what Mariani had legitimately done **subsequent** to the events giving rise to his past record.

13.    That Mariani respectfully submits that subsequent conduct inconsistent with being a danger to the community should in the appropriate case allow a judicial officer to conclude that reasonable conditions of release.

14.    That Mariani in the following sections will present the matters and issues germane to his Pretrial Detention. Mariani submits that review of the record compels that Mariani be provided a hearing **de novo** and ultimately denial of detention.

## I.

## MARIANI'S PRIOR RECORD

The prosecutor at the detention hearing correctly stated that Mariani was convicted of the offense of Arson relating to a 1988 fire at the location of Mariani's New York business. The incident can fairly be described as an insurance related fire. However, the prosecutor attempted to suggest that three injuries relating to the arson should be considered by the Court as an element of "safety to the community" relating to Mariani's bond. While Mariani agrees that any

4

arson contains an element of danger, Mariani would respectfully submit that the injuries sustained by the three individuals were not contemplated by Mariani. In particular, it should be noted that the fire (set by a coconspirator) took place at approximately four a.m. at a time in which no other individual should have been at or near the store. Unfortunately, the prosecutor's description attempts to suggest that Mariani intentionally sought to create the risk of injury to other persons. The prosecutor failed to inform the Magistrate-Judge that the issue of whether Mariani "knowingly" created the danger was disposed of by Mr. Mariani's sentencing Court which determined that Mariani **should not** receive the upward sentencing adjustment for knowingly risking injury. Thus the attempt to cast Mariani as one who would seek to burn people to death was unfounded.

The next instance of the Government's overzealousness relates to its description of Mr. Mariani participating in a "crime spree" involving violence. The first instance of the "crime spree" related to a dispute between Mariani and a motorist with whom Mariani had had a parking lot accident. There was absolutely no evidence that Mariani had targeted anyone to have this incident. In fact it is clear that this event was nothing more than a random isolated event as opposed to an individual conducting a "crime spree". In addition, Mr. Mariani's offense resulted from an argument between Mr. Mariani and the other motorist. While certainly not commendable the incident reflects events not dissimilar to that which happens countless times every day on South Florida roads and parking lots. To cite this one punch incident of "road rage" as a vehicle for pretrial detention hardly satisfies the purpose of the detention statute. It does illustrate the Government's propensity to place "spin" over substance.

The final incident relates to an uncharged (and obviously nonconvicted) 1995 accusation that Mariani impersonated an FBI agent. While it is somewhat an oxymoron for an FBI agent

5

(even a fictitious agent) to be a danger to the community it is obvious that had Mariani's supposed impersonation been significant he would have zealously been prosecuted. Instead the alleged conduct which purportedly involved an employment dispute not concerning Mariani was never charged as a criminal offense. While non charged conduct like this should not, even if true, place Mariani in a position to receive a citizenship award it does not rise to the level of conduct mandating detention.

## II.

## OTHER ALLEGATIONS

In an attempt to cast Mariani under a further cloud of suspicion, the Government proffered two additional claims to the Magistrate-Judge relating to the issue of danger to the community. The first claim of the Government involved an intercepted conversation between Mariani and an alleged co-conspirator. According to the prosecutor, Mariani stated "when I get out of jail there are a few people that need some whacks". However, a transcript submitted by the Government has Mariani stating "(SC) There's still a few people that need some whacks". Mariani submits that the actual context of the conversation would reveal that the conversation in question was not in anyway a plan or design to injure or hurt anyone. In fact, Mariani urges that the actual tape interception be reviewed by the Court. Mariani is confident that the tape would at worst reveal babbling hyperbole. No evidence exists that Mariani at any time acted in anyway to "whack" or injure anyone. However, the prosecutor's insertion of the words "when I get out of jail" casts the benign conversation in a totally inaccurate sinister context. The Magistrate-Judge having not heard the tape and not having an opportunity to compare the prosecutor's words with the actual conversation would naturally error on the side of detention. Mariani would urge that a complete review would remove this adverse taint from Mariani's case.

The second claim involves an alleged witness who supposedly claims that he is afraid of Mariani and would rather be held in contempt than testify. Mariani obviously has no ability to confront or cross examine this witness to determine not only the accuracy of the alleged statement but more importantly whether the "refusal" has to do with Mariani or other persons. Experience has taught that persons who claim "fear" in testifying are often seeking to shield other issues rather than the fear they are asserting. More fundamental is the fact that the witness has not provided any basis to conclude that Mariani's release from custody prior to trial would in anyway create a danger to the witness or any other persons.

### III.

### THE INDICTMENT

The Government claims that the conspiracy in this case was under the control of a fully inducted member of the Luchesse organized crime family, Marco Minuto. Mariani's alleged role in the conspiracy is limited in time and activity. The Government does not allege that Mariani is a member of any organized crime family. In fact, the Government at the bond hearing claimed that Mariani was an "enforcer" for co-defendant, Minuto and not an enforcer of the Luchesse family. Cutting through the Government's overgenerous description of Mariani as an enforcer reveals a single incident in which an allegedly illegal gambling debt was collected. The Government failed to disclose to the Court that the alleged victim of the extortion did not report the incident at the time it allegedly occurred. Further it is clear that the alleged victim has without fear conducted legitimate business discussions with Mariani subsequent to the alleged extortion. Further the Government's attempt to associate Mariani with an organized crime family makes little sense since the alleged member of the organized crime family who supposedly instructed Mariani is free on bond and not detained. Mariani is aware that each bond issue must

7

be decided individually. However, just in the case of sentencing, disportion between defendants should not color bond determinations. Mariani submits that in context of others, his alleged role in this case in terms of actual participation does not justify his detention and co-defendants release.

## IV.

### THE NEED FOR A HEARING DE NOVO

The Magistrate-Judge's finding that the Government had failed to establish "risk of flight" but had established "danger to the community" is consistent with Mariani's analysis that the Government succeeded in "throwing so much at the proverbial wall" that it hoped something would stick. In reality Mariani has provided during the past several months the best barometer or prediction of how he would act if released on bond. Most significant from the standpoint of danger is the fact that Mariani has been aware of the pending investigation and likely Indictment long prior to his Indictment. He obviously, according to the Government, is aware of the witnesses against him. He has not acted in anyway to endanger the safety of any witness. He has not made any threats to any individual concerning any testimony in this case. Mr. Mariani was literally waiting for the Government to arrest him. He had his bags packed every Friday morning anticipating a Government visit and his arrest. Had Mr. Mariani desired to flee or endanger witnesses or others he had ample opportunity. Instead, Mr. Mariani was devoted to the education of his girlfriend's children, the health of his landlord, who Mr. Mariani was able to nurse through his recuperation from open-heart surgery and living a non-dangerous lifestyle. Indeed if Mr. Mariani were really the "danger" that the Government claims he could have embarked on a last fling crime spree between the time of learning of the investigation and the time of his arrest. Likewise Mariani who had a passport and free to leave would have bolted

8

away.

Mariani submits that rather than focusing on the Government's distorted picture that this Court view Mariani in his real context and determine that Mariani does not pose any danger to the community between now and the time of trial which could not be protected by reasonable conditions of bond including electronic monitoring. Mariani submits that the most efficient and effective vehicle to flush these issues out would be at a hearing **de novo**.

WHEREFORE, Defendant Nicolo Mariani respectfully requests that this Court grant his Motion for Revocation of Pretrial Detention Order.

Respectfully submitted,

BRUCE A. ZIMET, P.A.
One Financial Plaza
Suite 2612
Fort Lauderdale, Florida 33394
(954) 764-7081 (Fort Lauderdale)
(305) 948-3648 (Miami)
(954) 760-4421 (Fax)

BY: _____
        BRUCE A. ZIMET, ESQ.
        Florida Bar No. 225053

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was mailed this ___1ST___ day of August, 2000 to: Mike Ditto, Assistant United States Attorney, 500 East Broward Boulevard, 7th Floor, Fort Lauderdale, Florida 33301.

_____
BRUCE A. ZIMET, ESQ.

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6088-CR-UNGARO-BENAGES

UNITED STATES OF AMERICA        )
Plaintiff,                      )
                                )
v.                              )
                                )
NICOLO MARIANI,                 )
Defendant.                      )
_____)

## DETENTION ORDER

Before the Court is the government's motion to detain
defendant Nicolo Mariani prior to trial and until the conclusion
thereof pursuant to 18 U.S.C. § 3142(e).  Having heard evidence
and considered the factors enumerated in Section 3142(g), the
Court finds that no condition or combination of conditions will
reasonably assure the safety of any other person and the
community.  Accordingly, the Court hereby orders that Nicolo
Mariani be detained prior to trial and until the conclusion
thereof under the provisions of 18 U.S.C. § 3142(i).

## FINDINGS OF FACT

1.  The defendant is charged with conspiring to violate the
Racketeer Influenced and Corrupt Organizations Act (RICO) in
violation of 18 U.S.C. § 1962(d) (Count 1), conspiring to affect
interstate commerce by extortion in violation of 18 U.S.C. § 1951
(Count 3), affecting interstate commerce by extortion in



violation of 18 U.S.C. § 1951 (Count 4),  conspiring to use extortionate means to collect credit, in violation of 18 U.S.C. § 894 (Count 5), using extortionate means to collect credit, in violation of 18 U.S.C. § 894 (Count 6), and conducting an illegal gambling business in violation of 18 U.S.C. § 1955 (Count 7).

2.    Based on the Indictment of the Grand Jury, the Court finds that the defendant is charged with a crime of violence that has as an element thereof, the use, attempted use, or threatened use of force against the person or property of another as required by 18 U.S.C. § 3142(f)(1)(A).  See 18 U.S.C. § 3156(a)(1)(4).

3.    The weight of the evidence against the defendant is substantial.  In the instant case, the government conducted a two-year investigation utilizing not only a cooperating witness but also electronic monitoring comprised both of a court authorized wire-interceptions and consensual recordings. In an intercepted conversation the defendant remarked that there were still a few people "that needed some whacks," thereby indicating a continued  willingness to perform violent acts.  The Indictment alleges that the defendant acted on behalf of Marco Minuto, a member of the Luchese Organized Crime Family.  The indictment specifies that "[i]t was further part of the conspiracy that Marco Minuto would direct defendant Nicolo Mariani and others to collect gambling debts by threatening

2

debtors with acts of violence or by physically harming them in order to collect debts.

4.  The defendant has a long history of violent acts, some of which were committed while on supervised release.  These criminal acts include, <u>inter alia</u>,:

(a) Arson, for which the defendant was sentenced to serve 46 months incarceration and three years of supervised release (May 17, 1990);

(b) Aggravated battery, committed while the defendant was on supervised release for Arson, and for which the defendant was sentenced to over two years confinement (August 14, 1995);

(c) Impersonating and FBI agent and attempting to gain entrance to a residence, for which the defendant was not convicted but which did constitute one of many violations of the defendant's supervised release (See Report and Recommendation <u>United States v. Maraiani</u>, Case No. 95-8008, Dated January 27, 1997; Govt Ex. 6.)

5.  Based on the above, the Court finds by clear and convincing evidence that the defendant poses a danger to the community and no condition or combination of conditions would reasonably assure that safety of any other person or the community.

Accordingly, the Court hereby ORDERS:

(a) That the defendant be committed to the custody of

3

the Attorney General for confinement in a correction facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal;

(b) That the defendant be afforded reasonable opportunity for private consultation with counsel; and

(c) That on order of a court of the United States, or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida, this /8ᵗʰ day of July, 2000

```
BARRY S. GARBER
UNITED STATES MAGISTRATE JUDGE
```

cc: AUSA Michael J. Dittoe
    Bruce A. Zimet, Esq.

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NUMBER |
| PLAINTIFF, | ) | 00-6088-CR-UNGARO-BENAGES |
| | ) | |
| VS. | ) | |
| | ) | |
| NICOLO MARIANI, | ) | THIS VOLUME: |
| | ) | PAGES 1 - 56 |
| DEFENDANT. | ) | |

(TRANSCRIPT BY TAPE)


TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD

BEFORE THE HONORABLE BARRY L. GARBER, IN MIAMI, MIAMI-DADE

COUNTY, FLORIDA, ON JULY 17, 2000, IN THE ABOVE-STYLED

MATTER.



APPEARANCES:

FOR THE GOVERNMENT:    **MICHAEL DITTOE, A.U.S.A.**
                       500 EAST BROWARD BLVD., 7TH FLOOR
                       FT. LAUDERDALE, FL 33301 954/356-7392


FOR THE DEFENDANT:     **BRUCE A. ZIMET, ESQ.**
                       ONE FINANCIAL PLAZA
                       SUITE 2612
                       FT. LAUDERDALE, FL 33301 954/764-7081

CARL SCHANZLEH
OFFICIAL COURT REPORTER
U. S. COURTHOUSE
299 E. BROWARD BLVD., 202B
FORT LAUDERDALE, FLORIDA 33301
954 769-5488

**DEFENDANT'S EXHIBIT**
B

1

2                          **TABLE OF CONTENTS**

3    **WITNESSES:**                **DIRECT   CROSS REDIRECT RECROSS**

4    TAMMY JOE KAYWORTH .................... 12        23         25

5    NICOLO MARIANI .............. 30        40

6    ROBERT PERKINS .............. 45        48

7                          **INDEX TO EXHIBITS**

8    **EXHIBITS**                    **MARKED FOR         RECEIVED**
                                **IDENTIFICATION     IN EVIDENCE**
9
     **DESCRIPTION**                **PAGE       LINE     PAGE     LINE**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  JULY 17, 2000, IN OPEN

2  COURT.)

3           THE CLERK:  UNITED STATES OF AMERICA VERSUS NICOLO

4  MARIANI, CASE NUMBER 00-6088-CRIMINAL-UNGARO-BENAGES.

5           WOULD COUNSEL PLEASE STATE THEIR APPEARANCES FOR

6  THE RECORD.

7           MR. DITTOE:  GOOD MORNING, YOUR HONOR, MICHAEL

8  DITTOE ON BEHALF OF THE UNITED STATES.

9           MR. ZIMET:  GOOD MORNING, JUDGE, BRUCE ZIMET ON

10  BEHALF OF MR. MARIANI WHO IS PRESENT.

11           THE COURT:  ALL RIGHT.  THIS MATTER IS BEFORE ME

12  FOR HEARING ON THE GOVERNMENT'S MOTION FOR PRETRIAL

13  DETENTION.

14           ARE THE PARTIES PREPARED TO PROCEED?

15           MR. ZIMET:  YES, SIR.

16           MR. DITTOE:  YES, WE ARE, YOUR HONOR.

17           THE COURT:  ALL RIGHT.  WOULD YOU PROFFER FIRST

18  THE FACTS.

19           MR. DITTOE:  CERTAINLY.

20           JUDGE, BEFORE I DO THAT, THOUGH, I JUST HAVE A

21  BRIEF PRELIMINARY MATTER TO BRING UP JUST TO PUT THE

22  PROCEDURAL POSTURE OF THE CASE IN CONTEXT.

23           THERE WERE MULTIPLE PRETRIAL DETENTION HEARINGS IN

24  THIS MATTER SCHEDULED PREVIOUSLY, AND THEN FINALLY THERE WAS

25  A HEARING THAT WAS HELD ON MAY THE 31ST BEFORE JUDGE LINNEA

4

```
 1   JOHNSON IN WEST PALM BEACH IN WHICH THE DEFENDANT STIPULATED

 2   ESSENTIALLY TO THE PRETRIAL DETENTION, AND I PROFFER THE

 3   TRANSCRIPT OF THAT FOR THE COURT AS GOVERNMENT'S EXHIBIT

 4   NUMBER 1.

 5             THE COURT:  MR. ZIMET, DO YOU HAVE A COPY?

 6             MR. ZIMET:  YES, I DO, JUDGE.

 7             THE COURT:  WHAT ARE YOU RELYING UPON THIS

 8   TRANSCRIPT FOR?

 9             MR. DITTOE:  IN THE TRANSCRIPT THERE IS INDICATION

10   THAT -- SPECIFICALLY ON PAGE 12 OF THE TRANSCRIPT THAT

11   BEFORE THE DEFENDANT WOULD BE ABLE TO APPLY TO HAVE A

12   HEARING SINCE HE STIPULATED AND ADMITTED TO PRETRIAL

13   DETENTION HEARING, THAT THERE WOULD BE A REQUIREMENT OF SOME

14   TYPE OF CHANGED CIRCUMSTANCE.

15             FOR EXAMPLE, THE JUDGE AT THE TOP OF PAGE 12, LINE

16   FOUR, NOTED, "IF SOMETHING CHANGES AND HIS CLIENT GETS

17   PARDONED, OR THE GOVERNMENT'S CASE FALLS APART SOMEBODY WILL

18   MOVE FOR SOMETHING DIFFERENT."

19             THEN I SAID, "THERE WOULD HAVE TO BE CHANGED

20   CIRCUMSTANCES, YOUR HONOR?"  THE COURT SAYS, "YES."

21   AGAIN, "ASSUMING IT IS NOT KNOWN TO THE COURT"?  AND THE

22   COURT REPLIES AGAIN, "YES."

23             AND, SO I JUST POINT THAT OUT IN TERMS OF THE

24   PROCEDURAL POSTURE OF THE CASE.  I NOTICE THERE HAS NOT BEEN

25   A MOTION FILED BY COUNSEL INDICATING ANY CHANGED
```

1    CIRCUMSTANCES.

2            HAVING SAID ALL OF THAT, HOWEVER, IF THE COURT

3    DETERMINES THAT WE SHOULD GO FORWARD WITH THE HEARING TODAY

4    WE ARE PREPARED TO GO FORWARD WITH THAT HEARING.

5            THE COURT:  ALL RIGHT.

6            KAREN, HOW IS IT THIS MATTER IS ON THE CALENDAR

7    INASMUCH AS APPARENTLY NO MOTION HAS BEEN FILED?

8            THE CLERK:  I DON'T KNOW, JUDGE.

9            THE COURT:  MR. ZIMET?

10           MR. ZIMET:  JUDGE, IF YOU LOOK AT PAGE TWO AND

11   THREE OF THE TRANSCRIPT, THIS HEARING ON MAY 31ST TOOK PLACE

12   PRIOR TO THE TIME THAT I WAS RETAINED AS COUNSEL IN THE

13   CASE.

14           THE COURT:  I AM GOING TO PERMIT THE MATTER TO GO

15   FORWARD.

16           GO AHEAD BY PROFFER INITIALLY.

17           MR. DITTOE:  YES, YOUR HONOR.

18           THE DEFENDANT IS FACING A SERIES OF RICO CHARGES.

19   SPECIFICALLY HE HAS BEEN CHARGED IN COUNT ONE OF THE

20   INDICTMENT WITH A CONSPIRACY TO VIOLATE THE RICO STATUTE,

21   AND THEN IN COUNTS FIVE AND SIX OF THE INDICTMENT WITH USING

22   EXTORTIONATE MEANS TO COLLECT A DEBT, AND FINALLY IN COUNT

23   SEVEN OF THE INDICTMENT WITH OPERATING AN INTERSTATE

24   GAMBLING BUSINESS.

25           THE INDICTMENT CHARGES THAT THE DEFENDANT WAS AN

1  ENFORCER FOR MARCO MANEUDO, WHO IS A MAIN GUY OR FULLY

2  INDUCTED MEMBER INTO THE LUCHESE ORGANIZED CRIME FAMILY.

3  SPECIFICALLY THIS DEFENDANT IS CHARGED WITH EXTORTIONATE

4  COLLECTION OF A DEBT FROM VARIOUS INDIVIDUALS, INCLUDING THE

5  OWNER OF PREFERRED TRAVEL TICKETS.

6        AS YOUR HONOR HAS REVIEWED, OR WOULD HAVE

7  OBVIOUSLY THE PRETRIAL SERVICES REPORT TO REVIEW, I WOULD

8  SUBMIT THAT THIS DEFENDANT HAS A DOCUMENTED HISTORY OF

9  CONSISTENT VIOLATIONS OF THE LAW AND REPEATED VIOLATIONS OF

10  COURT ORDERS AND DIRECTIVES WHEN HE WAS ON VARIOUS FORMS OF

11  RELEASE AND HAS A DEMONSTRATED PROPENSITY FOR VIOLENCE.

12        I WILL BRIEFLY SUMMARIZE THE DEFENDANT'S PRIOR

13  CRIMINAL CONDUCT AND HIS CONDUCT WHILE ON SUPERVISED

14  RELEASE.

15        IN FEBRUARY OF 1988, THE DEFENDANT COMMITTED AN

16  ARSON OF HIS STORE.  THE DEFENDANT WAS THE OWNER OF A DELI

17  AND A MEAT STORE, AND THE DEFENDANT COMMITTED ARSON OF THAT

18  STORE.

19        IN CONNECTION WITH THE COMMISSION OF THE ARSON, I

20  WOULD NOTE THAT THERE WAS AN INJURY TO SOMEONE WHO WAS

21  SLEEPING IN A BAR THAT WAS NEARBY THE BUILDING WHERE THE

22  DELI WAS LOCATED.  THERE WAS AN INJURY TO A FELLOW

23  CO-CONSPIRATOR WHEN THE GASOLINE THAT WAS USED TO COMMIT THE

24  ARSON BURNED AND THEN BURNED THE CO-CONSPIRATOR, AND THEN

25  FINALLY THERE WAS AN INJURY TO A FIREMAN WHEN THE FIREMAN

1   WAS ATTEMPTING TO PUT OUT THE FIRE.  SPECIFICALLY THE

2   FIREMAN HAD A BROKEN LEG AS A RESULT OF THAT.

3         ALSO, THE PRETRIAL SERVICES REPORT AND THE PRIOR

4   INVESTIGATION INDICATES THAT THE DEFENDANT USED AN ALIAS BY

5   THE NAME OF NICK BRUNO SOMETIME PRIOR OR IN CONNECTION --

6   EITHER PRIOR TO OR IN CONNECTION WITH THAT ARSON.

7         THEN THE NEXT DEFENDANT'S ARREST, OR CHARGE WAS IN

8   MAY OF 1989, AND THAT WAS A SEEMINGLY MINOR CHARGE BUT IT

9   WAS FAILURE TO APPEAR ON RECKLESS DRIVING, AND THAT BEGINS

10  THE HISTORY OF THE DEFENDANT'S FLIGHT TO AVOID PROSECUTION,

11  ALTHOUGH IN THIS CASE A FAIRLY MINOR CASE, AND IS HIS

12  CONSISTENT USE OF ALIASES.

13        NOW, THE DEFENDANT WAS THEN PLACED ON PROBATION --

14  STRIKE THAT.  HE WAS PLACED ON SUPERVISED RELEASE FOLLOWING

15  HIS INCARCERATION FOR THE ARSON.  WHILE ON SUPERVISED

16  RELEASE FOLLOWING HIS -- HIS RELEASE FROM INCARCERATION, THE

17  DEFENDANT EMBARKED UPON A CRIME SPREE THAT RESULTED IN

18  MULTIPLE INSTANCES OF VIOLATIONS OF THE SUPERVISED RELEASE,

19  AND THIS CRIME SPREE INVOLVED VIOLENCE.

20        SPECIFICALLY THERE WAS AN AGGRAVATED BATTERY THAT

21  OCCURRED WHEN THERE WAS AN AUTOMOBILE ACCIDENT INVOLVING

22  THIS DEFENDANT AND A VICTIM BY THE NAME OF TODD POSEY.  THIS

23  PARTICULAR DEFENDANT FOLLOWING THAT AUTOMOBILE ACCIDENT

24  PUNCHED MR. POSEY IN THE FACE, AND THAT PUNCH RESULTED IN

25  THE DEFENDANT -- IN MR. POSEY'S JAW BEING BROKEN IN TWO

1    PLACES, MEDICAL ATTENTION BEING REQUIRED, SURGERY BEING

2    REQUIRED.  MR. POSEY'S JAW WAS WIRED SHUT FOR SEVEN WEEKS.

3    MR. POSEY WAS NOT ABLE TO EAT SOLID FOOD FOR 12 WEEKS.

4    THERE WAS PERMANENT DAMAGE TO HIS TEETH, AND THE VICTIM OF

5    THE CRIME WAS REQUIRED TO TAKE 130 DAYS -- 130 HOURS, EXCUSE

6    ME, OFF OF WORK.

7              IN ADDITION TO THAT WHILE ON SUPERVISED RELEASE

8    THIS DEFENDANT IMPERSONATED AN FBI AGENT AND ATTEMPTED TO

9    GAIN ILLEGAL ENTRY TO THE -- TO THE HOUSE OF A MAN BY THE

10   NAME OF CORDO.  AND HE WAS ATTEMPTING TO DO THIS IN ORDER TO

11   INTIMIDATE MR. CORDO INTO GIVING A JOB BACK TO SOMEONE THAT

12   MR. CORDO HAD FIRED, AND THE DEFENDANT USED INTIMIDATION AND

13   THREATS OF FORCE TO ATTEMPT TO ENTER INTO THE HOUSE,

14   IMPERSONATING AN FBI AGENT AND DEMANDING ENTRANCE TO THE

15   HOUSE.

16             NOW, WHEN THE VICTIM OF THAT PARTICULAR OFFENSE

17   DENIED THE ENTRANCE TO THE HOUSE, THIS DEFENDANT PUT HIS

18   HAND IN THE POSITION OF A GUN WHICH -- AIM IT AT THE PICTURE

19   WINDOW AND THEN PULL IT.

20             NOW, THAT INCIDENT CAUSED CONSIDERABLE

21   PSYCHOLOGICAL TRAUMA TO A MINOR CHILD THAT WAS PRESENT --

22   MR. CORDO'S CHILD THAT WAS PRESENT, REQUIRING THAT CHILD TO

23   RECEIVE COUNSELING FROM A MENTAL HEALTH PROFESSIONAL.

24             WHEN THE DEFENDANT WAS ARRESTED ON THE VIOLATION

25   OF SUPERVISED RELEASE IN WHICH HE PRETENDED HE WAS AN FBI

1    AGENT, MULTIPLE FALSE IDENTIFICATION DOCUMENTS WERE FOUND,

2    MULTIPLE CREDIT CARD NUMBERS INDICATING ACCESS TO CREDIT

3    CARD DEVICES WERE FOUND, AND THESE FALSE IDENTIFICATIONS

4    WERE ALL HAD THE PHOTOGRAPH OF MR. MARIANI BUT HAD DIFFERENT

5    NAMES ATTACHED TO THEM.  OBVIOUSLY THE USE OF THE FALSE

6    IDENTIFICATION WOULD ENABLE MR. MARIANI TO FLEE IN ADDITION

7    TO COMMIT THE CRIMES RELATED TO FRAUD.

8         NOW, WHEN MR. MARIANI WAS CHARGED WITH VIOLATING

9    THE SUPERVISED RELEASE IN CONNECTION WITH THE TODD POSEY

10   INCIDENT, WHICH IS THE AUTOMOBILE ACCIDENT, HE FLED.  HE

11   FLED BOTH THE SCENE OF THE ACCIDENT -- THE SCENE WHERE THE

12   CRIME OCCURRED AND HE FAILED TO REPORT THESE VIOLATIONS TO

13   HIS PROBATION OFFICER ON SUPERVISED RELEASE REQUIRING A

14   WARRANT TO BE ISSUED AND CONSIDERABLE TIME AND EXPENSE

15   UNDERTAKEN BY THE MARSHAL SERVICE TO TRACK DOWN MR. MARIANI

16   AND FINALLY ARREST HIM.

17        SO HE HAS A DEMONSTRATED HISTORY OF VIOLENCE AND A

18   DEMONSTRATED HISTORY OF FLEEING FROM PROSECUTION BEFORE THIS

19   COURT.

20        JUST TO CONCLUDE MATTERS, SOME OF THE EVIDENCE IN

21   THIS CASE CONSISTS OF A TITLE THREE ELECTRONIC INTERCEPTION

22   IN WHICH MR. MARIANI WHILE HE WAS IN JAIL FOR THE SUPERVISED

23   RELEASE SPEAKING TO A FELLOW CO-CONSPIRATOR SAID, "WHEN I

24   GET OUT OF JAIL THERE ARE A FEW PEOPLE THAT NEED SOME

25   WHACKS," MEANING THAT THERE ARE A FEW PEOPLE WHO NEED BE

1   WHACKED OR HIT.  AND THE CO-CONSPIRATOR SAID TO MR. MARIANI,

2   THE DEFENDANT IN THIS CASE, "WELL, I GUESS A LEOPARD CAN'T

3   CHANGE HIS SPOTS."

4          NOW, AFTER THE DEFENDANT WAS ARRESTED, THE

5   DEFENDANT MADE SOME VOLUNTEERED STATEMENTS.  THESE WERE

6   STATEMENTS THAT WERE NOT MADE PURSUANT TO QUESTIONING, THERE

7   WAS NO MIRANDA WARNINGS GIVEN AT THIS TIME, THEY WERE

8   VOLUNTEERED STATEMENTS, AND THE DEFENDANT ESSENTIALLY SAID,

9   "WHAT'S THE MATTER WITH YOU GUYS," REFERRING TO THE FBI

10  AGENTS, "YOU USUALLY ARREST PEOPLE ON FRIDAY."

11         THE ARREST IN THIS CASE DID NOT OCCUR ON FRIDAY.

12  THE DEFENDANT THEN CONTINUED ON TO SAY THAT, "YOU KNOW,

13  EVERY FRIDAY I LEAVE.  I GO A DIFFERENT LOCATION EVERY

14  FRIDAY, BECAUSE YOU GUYS ALWAYS ARREST PEOPLE ON FRIDAY SO

15  WE SPEND THE WEEKEND IN JAIL."  AND, SO THAT INDICATED AN

16  INTENT IN THIS CASE TO FLEE BECAUSE SPECIFICALLY HE SAID, "I

17  GO TO ANOTHER LOCATION EVERY FRIDAY."

18         DURING THE COURSE OF THE INVESTIGATION WE

19  HAD RECOURSE TO USE GRAND JURY SUBPOENAS.  THERE WAS ONE

20  WITNESS WHO WAS SUBPOENAED BEFORE THE GRAND JURY, A WITNESS

21  BY THE NAME OF KLINGER.  THAT WITNESS INFORMED US THAT THIS

22  DEFENDANT INSTRUCTED HIM TO LIE IN FRONT OF THE GRAND JURY

23  ABOUT A DEBT THAT WAS OWED IN RELATIONSHIP TO MR. KLINGER,

24  LIE ABOUT THE NATURE AND ORIGIN OF THE DEBT.

25         MR. KLINGER HAS INDICATED THAT HE IS AFRAID OF

1  THIS DEFENDANT AND WAS AFRAID TO TESTIFY AT TRIAL, AND

2  INDEED WOULD SUFFER THE PAINS OF CONTEMPT RATHER THAN

3  TESTIFY AT TRIAL.

4          FINALLY THERE WERE MULTIPLE ADDRESSES THAT THIS

5  DEFENDANT -- THAT WAS ASSOCIATED WITH THIS DEFENDANT

6  FOLLOWING HIS ARREST.  THE ADDRESS IN WHICH HE WAS LIVING,

7  THE RENTAL CAR THAT HE WAS USING HAD ONE ADDRESS, HIS

8  CELLPHONE HAD ANOTHER ADDRESS, AND THE POSTAL SERVICE HAD

9  YET A FOURTH ADDRESS THAT WAS ASSOCIATED WITH THIS

10  DEFENDANT.

11          BASED UPON THIS EVIDENCE, YOUR HONOR, THE UNITED

12  STATES SUBMITS THAT WE HAVE ESTABLISHED BY CLEAR AND

13  CONVINCING EVIDENCE THAT THE DEFENDANT IS A DANGER TO THE

14  COMMUNITY, AND HAVE ESTABLISHED BY A PREPONDERANCE OF THE

15  EVIDENCE THAT THIS DEFENDANT -- THERE ARE NO REASONABLE

16  CONDITIONS THAT WOULD ASSURE THE PRESENCE OF THIS DEFENDANT

17  AT TRIAL GIVEN THE FACT THAT HE HAS IN FACT FLED BEFORE FROM

18  PRIOR COURT APPEARANCES, SPECIFICALLY THE SUPERVISED RELEASE

19  VIOLATIONS.

20          THE COURT:  WILL YOU CALL A WITNESS FORWARD,

21  PLEASE, MR. DITTOE.

22          MR. DITTOE:  YES, YOUR HONOR.

23          SPECIAL AGENT TAMMY KAYWORTH OF THE FEDERAL BUREAU

24  OF INVESTIGATION.

25          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

1          DO YOU SOLEMNLY SWEAR TO TELL THE TRUTH, THE WHOLE

2    TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

3          THE WITNESS:  YES, I DO.

4          THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

5          PLEASE STATE YOUR NAME FOR THE RECORD AND SPELL

6    YOUR LAST NAME.

7          THE WITNESS:  TAMMY JOE KAYWORTH, K-A-Y-W-O-R-T-H.

8          THE COURT:  YOU ARE A SPECIAL AGENT WITH THE

9    FEDERAL BUREAU OF INVESTIGATION?

10         THE WITNESS:  YES, YOUR HONOR.

11         THE COURT:  ALL RIGHT.

12         GO AHEAD, COUNSEL.

13                   **TAMMY JOE KAYWORTH,**

14   BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

15                   **CROSS EXAMINATION**

16   BY MR. ZIMET:

17   Q.   MA'AM, ARE YOU FAMILIAR WITH THE CASE AGAINST

18   MR. MARIANI?

19   A.   YES, SIR, I AM.

20   Q.   AND ARE YOU FAMILIAR WITH WHAT THE PROSECUTOR JUST

21   PROFFERED TO THE COURT?

22   A.   YES, SIR.

23   Q.   AND HAVE YOU INVESTIGATED THE FACTS WHICH THE

24   PROSECUTOR JUST PRESENTED TO THE COURT?

25   A.   YES, SIR.

13

1   Q.    AND YOU HAVE KNOWLEDGE OF THE CONTENT OF WHAT HE HAS

2   SAID TO THE COURT, IS THAT CORRECT?

3   A.    YES, SIR, I DO.

4   Q.    LET'S START OUT WITH THE INCIDENT WHICH THE PROSECUTOR

5   DESCRIBED AS PART OF A PATTERN OF A -- OF VIOLENT CRIMINAL

6   BEHAVIOR.  I THINK HE USED WORDS TO THAT EFFECT.  DO YOU

7   RECALL THAT?

8   A.    YES, I DO.

9   Q.    AND THE INSTANCE THAT HE DESCRIBED WAS AN INSTANCE

10  WHERE A MOTORIST WAS PUNCHED BY MR. MARIANI, DO YOU RECALL

11  THAT?

12  A.    YES, SIR.

13  Q.    OKAY.  AND THAT TOOK PLACE WHERE?

14  A.    IN BROWARD COUNTY.

15  Q.    AND THAT WAS AN INSTANCE WHERE MR. MARIANI HAD NO

16  KNOWLEDGE OF THE MOTORIST BEFORE THIS INCIDENT OCCURRED, IS

17  THAT CORRECT?

18  A.    CORRECT.

19  Q.    THIS WAS AN INSTANCE OF, FOR LACK OF A BETTER

20  DESCRIPTION, ROAD RAGE BETWEEN MR. MARIANI AND THE DRIVER OF

21  THE OTHER CAR, IS THAT CORRECT?

22          MR. DITTOE:  OBJECTION.  CALLS FOR A CONCLUSION.

23          THE COURT:  OVERRULED.

24  BY MR. ZIMET:

25  Q.    YOU INVESTIGATED THIS CASE, DID YOU NOT?

1   A.    YES, SIR, I DID.

2   Q.    AND TO DESCRIBE IT AS ROAD RAGE WOULD PROBABLY BE THE

3   MOST ACCURATE DESCRIPTION OF MR. MARIANI'S INVOLVEMENT IN

4   THAT CASE, IS THAT CORRECT?

5   A.    I CAN'T REALLY GIVE MY OPINION.

6   Q.    WELL, YOU CAN, YOU JUST DON'T WANT TO.

7         MR. DITTOE:  OBJECTION.  MOVE TO STRIKE.

8   ARGUMENTATIVE.

9         THE COURT:  OVERRULED.

10        THE WITNESS:  I DIDN'T INVESTIGATE THE ACTUAL

11  ACCIDENT AND THE AGGRAVATED BATTERY.

12  BY MR. ZIMET:

13  Q.    AS FAR AS YOU KNOW, THIS WAS AN ACCIDENT INVOLVING TWO

14  PEOPLE THAT HAD NOTHING TO DO WITH EACH OTHER BEFORE THE

15  ACCIDENT, IS THAT CORRECT?

16  A.    THAT'S CORRECT.

17  Q.    AND, AS FAR AS YOU KNEW, THIS WAS NOT PART OF ANY

18  CRIMINAL ACTIVITY OF MR. MARIANI THAT HE MIGHT HAVE BEEN

19  ALLEGEDLY INVOLVED IN AT THAT TIME, ISN'T THAT CORRECT?

20  A.    CORRECT.

21  Q.    AND, AS FAR AS THE ARSON WHICH TOOK PLACE BEFORE THAT

22  TIME, THAT'S CORRECT, THE ARSON WAS BEFORE THAT TIME?

23  A.    THAT'S CORRECT.

24  Q.    THE ARSON -- THE FACTS OF THE ARSON, MR. MARIANI DID

25  NOT SET THE FIRE HIMSELF, DID HE?

```
 1   A.    I'M NOT SURE OF THAT.

 2   Q.    IN FACT, ALL OF THE INSTANCES OF INJURY TO OTHER

 3   PEOPLE, ALL THAT WAS CAUSED BY THE PERSON WHO SET THE FIRE

 4   WAS SOMEONE OTHER THAN MR. MARIANI, ISN'T THAT CORRECT?

 5   A.    MR. MARIANI WAS CONVICTED OF THE ARSON.

 6   Q.    I UNDERSTAND THAT.  BUT THE DESCRIPTION OF WHO WAS

 7   RESPONSIBLE FOR PEOPLE GETTING SPECIFICALLY INJURED, THAT

 8   QUESTION WAS BASED UPON, AND THOSE FACTS ARE BASED UPON THE

 9   ACTUAL PERSON SETTING THE FIRE, ISN'T THAT CORRECT?

10   A.    CORRECT.

11   Q.    AND THAT PERSON WAS NOT MR. MARIANI, WAS IT?

12            MR. DITTOE:  JUDGE, THE WITNESS TESTIFIED SHE

13   DIDN'T KNOW.

14            THE COURT:  DO YOU KNOW WHO -- WHETHER HE WAS

15   CHARGED WITH ACTUALLY SETTING THE FIRE?

16            THE WITNESS:  NO, YOUR HONOR.

17            THE COURT:  ALL RIGHT.  GO AHEAD, MR. ZIMET.

18            MR. ZIMET:  ALL RIGHT.

19   BY MR. ZIMET:

20   Q.    NOW, THE INSTANCES WHERE MR. MARIANI WAS ON SUPERVISED

21   RELEASE AND THE PROSECUTOR DESCRIBED THE FACT HE DID NOT

22   APPEAR AT SOME PROCEEDING, DO YOU RECALL THAT?

23   A.    YES, SIR.

24   Q.    WHICH PROCEEDING DID HE NOT APPEAR AT?

25   A.    WHEN HE VIOLATES HIS SUPERVISED RELEASE HE IS SUPPOSED
```

```
 1   TO LET HIS PROBATION OFFICER KNOW AND HE DID NOT LET HER
 2   KNOW.
 3   Q.   OKAY.  AND A WARRANT WAS THEN ISSUED?
 4   A.   YES, SIR.
 5   Q.   AND HE WAS ARRESTED?
 6   A.   YES.
 7   Q.   WHERE WAS HE ARRESTED?
 8   A.   IN BOCA RATON, FLORIDA.
 9   Q.   AND WHERE WAS HE RESIDING PRIOR TO THE VIOLATION
10   OCCURRING?
11   A.   THE LAST KNOWN ADDRESS WE HAD WAS 500 SOUTH OCEAN
12   BOULEVARD IN FORT LAUDERDALE.
13   Q.   SO HE WAS IN THE SAME SOUTHERN DISTRICT OF FLORIDA, IS
14   THAT CORRECT?
15   A.   CORRECT.
16   Q.   OKAY.  AND HE WAS ARRESTED -- HE WAS SENTENCED IN THAT
17   CASE, IS THAT CORRECT?
18   A.   CORRECT.
19   Q.   NOW, AS FAR AS THIS CASE ITSELF IS CONCERNED,
20   MR. MARIANI BECAME AWARE OF THE INVESTIGATION AT THE TIME OF
21   THE GRAND JURY WITNESS, IS THAT CORRECT, BEING SUBPOENAED?
22   AT LEAST AT THAT TIME.
23   A.   YES.
24   Q.   AND WHEN WAS THAT?  APPROXIMATELY.  I DON'T NEED THE
25   EXACT DATE.
```

```
 1   A.    APPROXIMATELY '90 -- THE END OF '98.

 2   Q.    OKAY.  AND, SO HE WAS AWARE OF THE FACT THAT HE WAS A

 3   TARGET OF AN INVESTIGATION FOR AT LEAST A YEAR, TO A YEAR

 4   AND A HALF BEFORE HIS ARREST, WOULD THAT BE SAFE TO SAY?

 5              MR. DITTOE:  OBJECTION, YOUR HONOR.  CALLS FOR

 6   PERSONAL KNOWLEDGE OF THE WITNESS.

 7              THE COURT:  IF YOU KNOW.

 8              THE WITNESS:  I'M NOT QUITE SURE.

 9   BY MR. ZIMET:

10   Q.    WELL, YOU ARE AWARE THAT HE WAS AWARE THAT A PERSON WAS

11   GOING TO THE GRAND JURY, IS THAT CORRECT?

12   A.    CORRECT.

13   Q.    AND THE '98 DATE YOU GAVE WAS THE DATE THAT THAT

14   KNOWLEDGE BECAME KNOWN TO MR. MARIANI, IS THAT CORRECT?

15   A.    CORRECT.

16   Q.    AND, SO -- AND HE ALSO KNEW FROM CONVERSATIONS WITH THE

17   WITNESS, THE WITNESS WAS GOING TO TESTIFY ABOUT ALLEGED

18   INVOLVEMENT INVOLVING MR. MARIANI AND THE WITNESS, IS THAT

19   CORRECT?

20   A.    CORRECT.

21   Q.    SO IT WOULD BE SAFE TO CONCLUDE THAT MR. MARIANI KNEW

22   OF THE INVESTIGATION AT LEAST A YEAR TO A YEAR AND A HALF

23   PRIOR TO HIM BEING INDICTED, IS THAT CORRECT?

24   A.    I CAN'T BE SURE.

25   Q.    OKAY.  NOW, DURING THAT TIME PERIOD IS IT NOT CORRECT
```

```
 1   THAT MR. MARIANI ACQUIRED A UNITED STATES PASSPORT?

 2   A.    NOT TO MY KNOWLEDGE.

 3   Q.    HE CERTAINLY HAD THE ABILITY TO LEAVE THE UNITED STATES

 4   AT THAT TIME IF HE WANTED TO, ISN'T THAT CORRECT?

 5   A.    CORRECT.

 6   Q.    HE CERTAINLY HAD THE ABILITY TO LEAVE FLORIDA AT THAT

 7   POINT, ISN'T THAT CORRECT?

 8   A.    CORRECT.

 9   Q.    HE CERTAINLY HAD THE ABILITY TO LEAVE THE SOUTHERN

10   DISTRICT OF FLORIDA IF HE WANTED TO, ISN'T THAT CORRECT?

11   A.    YES, SIR.

12   Q.    SO FROM THE TIME -- AND IF YOUR DATE IS WRONG, WHATEVER

13   DATE THAT WAS, IT WAS THE END OF '98 OR IF IT WAS IN '99,

14   WHENEVER THAT TIME PERIOD WAS UNTIL THE TIME OF HIS ARREST

15   HE REMAINED RIGHT HERE IN THE SOUTHERN DISTRICT OF FLORIDA,

16   ISN'T THAT CORRECT?

17   A.    THAT'S CORRECT.  BUT HE SPONTANEOUSLY STATED TO

18   DETECTIVES AFTER HE WAS ARRESTED THAT HE PURPOSELY WOULD

19   MOVE --

20   Q.    WELL, WE WILL GET TO THAT IN A SECOND.  DON'T WORRY

21   WITH ABOUT THAT.

22            MR. DITTOE:  JUDGE, OBJECTION, YOUR HONOR.  THE

23   WITNESS IS ATTEMPTING TO ANSWER COUNSEL'S QUESTION AND

24   COUNSEL CUT THE WITNESS OFF.

25            THE COURT:  ANYTHING FURTHER YOU WANT TO ADD TO
```

```
 1   YOUR ANSWER?

 2           THE WITNESS:  IN FACT, HE HAD STATED HE WAS GOING

 3   TO LEAVE THAT FRIDAY TO MARCO ISLAND TO AVOID BEING ARRESTED

 4   BY THE FBI.

 5   BY MR. ZIMET:

 6   Q.   OKAY.  NOW, LET'S TALK ABOUT WHAT HIS FAMILY SITUATION

 7   WAS IN THE SPRING OF 19 -- SPRING OF 2000, OKAY?

 8   A.   OKAY.

 9   Q.   YOU WERE INVOLVED IN INVESTIGATING TRYING TO FIND OUT

10   EVERYTHING YOU COULD ABOUT MR. MARIANI, ISN'T THAT CORRECT?

11   A.   YES, SIR.

12   Q.   YOU WERE AWARE THAT HE WAS ENGAGED TO A WOMAN TO MARRY,

13   IS THAT CORRECT?

14   A.   I'M NOT AWARE OF THAT.

15   Q.   WELL, HE HAD A GIRLFRIEND, DID HE NOT?

16   A.   YES, HE DID.

17   Q.   OKAY.  AND HE HAD INVOLVEMENT WITH THAT GIRLFRIEND FROM

18   THE STANDPOINT OF BEING INVOLVED WITH HER CHILDREN, ISN'T

19   THAT CORRECT?

20   A.   I'M NOT SURE OF THAT.

21   Q.   DID YOU DO ANY INVESTIGATION TO FIND OUT WHETHER OR NOT

22   HE WAS DOING THE THINGS CONSISTENT WITH A PERSON STAYING

23   AROUND, SUCH AS BEING INVOLVED IN THE PERSONAL AFFAIRS WITH

24   THOSE CHILDREN?

25   A.   MY INVESTIGATION REVEALED THAT HE HAD BEEN STAYING AT
```

```
 1   FOUR TO FIVE DIFFERENT ADDRESSES, INCLUDING PERIODICALLY AT

 2   HIS GIRLFRIEND'S RESIDENCE WHICH WAS ABOVE THE HAIR SALON

 3   THAT SHE WORKED AT.

 4   Q.    YOU WOULD ALSO AGREE THAT IT IS NOT UNUSUAL FOR A

 5   BOYFRIEND OR FIANCEE TO OCCASIONALLY STAY OVERNIGHT WITH

 6   THEIR PERSON THAT HE ARE GOING TO MARRY IF THEY ARE NOT IN

 7   FACT LIVING WITH THEM?

 8   A.    YES, SIR.

 9   Q.    OKAY.  SO THAT WOULD NOT BE UNUSUAL, CORRECT?

10   A.    NO.

11   Q.    AND THE PERSON -- THE PLACE THAT HE WAS ARRESTED AT,

12   THAT WAS A PERSON HE WAS DOING SOME WORK FOR, ISN'T THAT

13   CORRECT?

14   A.    THAT'S CORRECT.

15   Q.    MR. PERKINS?

16   A.    YES, 3250 NORTHEAST 28TH STREET.

17   Q.    AND MR. PERKINS HAS BEEN INTERVIEWED EXTENSIVELY BY THE

18   FBI, ISN'T THAT CORRECT?

19   A.    TO MY KNOWLEDGE HE WAS, YES.

20   Q.    AND MR. PERKINS TOLD THE FBI THAT IN FACT MR. MARIANI

21   WAS WELL AWARE HE WAS ABOUT TO BE CHARGED, ISN'T THAT

22   CORRECT?

23   A.    I'M NOT SURE OF THAT.

24   Q.    AND DID MR. PERKINS ALSO TELL THE FBI THAT IN FACT HE

25   WAS AWARE THAT THE FBI GENERALLY ARRESTED PEOPLE ON FRIDAY,
```

```
 1   AND IN FACT ON FRIDAY MORNINGS WOULD SIT DOWN IN

 2   MR. PERKINS' HOUSE WAITING FOR THE FBI TO COME TO ARREST

 3   HIM, ISN'T THAT CORRECT?

 4   A.    I WASN'T IN THAT INTERVIEW.  I CAN'T BE SURE OF THAT.

 5   Q.    ISN'T IT ALSO CORRECT THAT MR. MARIANI AT VARIOUS TIMES

 6   HAD A -- REPHRASE THE QUESTION.

 7            ISN'T IT CORRECT FROM YOUR INVESTIGATION THAT

 8   MR. MARIANI HAD HIRED AN ATTORNEY PRIOR TO THE TIME OF HIS

 9   ARREST?

10   A.    I'M NOT AWARE OF THAT.

11   Q.    DID YOU KNOW THAT MR. MARIANI HAD A PREVIOUS ATTORNEY

12   BEFORE MYSELF IN THIS CASE?

13   A.    YES, SIR.

14   Q.    THAT WAS MR. GRILLO?

15   A.    YES.

16            MR. DITTOE:  OBJECTION.  IRRELEVANT.  THIS IS MORE

17   ARGUMENT, YOUR HONOR.

18            THE COURT:  WHAT IS THE RELEVANCE OF THIS?

19            MR. ZIMET:  THE RELEVANCE, JUDGE, A PERSON WHO

20   RETAINS AN ATTORNEY PRIOR TO THE TIME OF BEING ARRESTED

21   KNOWING THEY ARE ABOUT TO BE ARRESTED IS GENERALLY --

22            THE COURT:  ALL RIGHT.  I WILL OVERRULE THE

23   OBJECTION.

24            THE WITNESS:  YES, SIR, HE HAD AN ATTORNEY PRIOR

25   TO YOU.
```

```
 1  BY MR. ZIMET:

 2  Q.   AND FROM YOUR INFORMATION WASN'T IT CLEAR THAT

 3  MR. GRILLO HAD BEEN RETAINED PRIOR TO THE TIME MR. MARIANI

 4  BEING ARRESTED?

 5  A.   I BELIEVE HE WAS, YES.

 6  Q.   AND WOULD THAT NOT BE CONSISTENT OF A PERSON WHO WAS

 7  SEEKING TO STAY HERE AND FIGHT THE CHARGES WITH LEGAL

 8  COUNSEL?

 9         MR. DITTOE:  OBJECTION, YOUR HONOR.  IT IS THE

10  ULTIMATE CONCLUSION.

11         THE COURT:  OVERRULED.

12  BY MR. ZIMET:

13  Q.   YOU CAN ANSWER.

14  A.   I DON'T KNOW HOW LONG HE HAD OBTAINED MR. GRILLO.

15         THE COURT:  ANYTHING FURTHER, MR. ZIMET?

16         MR. ZIMET:  NOT OF THIS WITNESS, JUDGE.

17         THE COURT:  ALL RIGHT.

18         MR. DITTOE:  YOUR HONOR, I'VE GOT SOME VERY

19  BRIEF --

20         THE COURT:  DO YOU HAVE ANY QUESTIONS OF THIS

21  WITNESS?

22         MR. DITTOE:  YES, YOUR HONOR, VERY BRIEF.

23         THE COURT:  ALL RIGHT.

24         MR. ZIMET, I DIDN'T MEAN TO CUT YOU OFF.  HAD YOU

25  COMPLETED YOUR EXAMINATION?
```

```
 1            MR. ZIMET:  I HAD A COUPLE MORE AREAS, JUDGE, BUT

 2   LET'S HAVE HIS EXAMINATION THEN I WILL -- IF THERE IS

 3   ANYTHING I WANT TO FINISH UP ON I WILL.

 4            THE COURT:  ALL RIGHT.

 5                    REDIRECT EXAMINATION

 6   BY MR. DITTOE:

 7   Q.   SHOWING YOU WHAT'S BEEN MARKED FOR PURPOSES OF

 8   IDENTIFICATION AS GOVERNMENT'S EXHIBIT NUMBER 2.

 9            THE COURT:  WHAT IS EXHIBIT 2.

10            MR. DITTOE:  YOUR HONOR, IT IS A MEMORANDUM

11   INTERVIEW OF ROBERT PERKINS, THE PERSON WITH WHOM THE

12   DEFENDANT WAS LIVING AT THE TIME OF HIS ARREST.

13            THE COURT:  ALL RIGHT.

14            MR. DITTOE:  BECAUSE THERE WERE SOME QUESTIONS

15   CONCERNING WHAT MR. PERKINS ALLEGEDLY TOLD THE VARIOUS FBI

16   AGENTS.

17            THE COURT:  ALL RIGHT.

18   BY MR. DITTOE:

19   Q.   AGENT KAYWORTH, I DIRECT YOUR ATTENTION TO THE SECOND

20   PARAGRAPH ON PAGE ONE, SPECIFICALLY THE LITTLE BLACKENED

21   AREA THAT I HAVE.

22            COULD YOU PLEASE READ THAT SENTENCE WHAT

23   MR. PERKINS ALSO SAID ABOUT THE DEFENDANT MARIANI.

24   A.   "PERKINS STATED THAT MARIANI CARRIED HIMSELF LIKE HE

25   WANTED TO BE A TOUGH GUY WHO WAS PRETTY INTIMIDATING AND WHO
```

1   PROCESSED A NEW YORK ATTITUDE."

2   Q.   NOW, SHOWING YOU WHAT'S BEEN MARKED FOR PURPOSES OF

3   IDENTIFICATION AS GOVERNMENT'S EXHIBIT NUMBER 8, IS THIS THE

4   PRESENTENCE INVESTIGATION PREPARED BY THE PROBATION

5   DEPARTMENT IN CONNECTION WITH THE ARSON CRIME THAT THE

6   DEFENDANT WAS CHARGED AND CONVICTED OF?

7   A.   YES, IT IS.

8   Q.   DO YOU RECALL A SERIES OF QUESTIONS BY MR. ZIMET THAT

9   TENDED TO INDICATE THAT THE DEFENDANT MARIANI WAS NOT

10  PERSONALLY INVOLVED IN SETTING THE FIRE.  DO YOU RECALL

11  THOSE QUESTIONS?

12  A.   YES, I DO.

13  Q.   I DIRECT YOUR ATTENTION TO PARAGRAPH FIVE OF THE REPORT

14  ON PAGE TWO.

15       WOULD YOU PLEASE READ THE HIGHLIGHTED SECTION

16  WHERE I AM NOW INDICATING WITH MY INDEX FINGER.

17  A.   "THE DEFENDANT THEN WENT UPSTAIRS TO POUR GASOLINE IN

18  THE DELICATESSEN LEAVING HEMENEZ TO CONTINUE POURING

19  GASOLINE IN THE BASEMENT.  WITHOUT WARNING AND

20  UNINTENTIONALLY THERE WAS AN EXPLOSION IN THE BASEMENT WHILE

21  HEMENEZ REMAINED THERE CAUSING HEMENEZ TO SUFFER A NUMBER OF

22  BURNS ON HIS FACE AND HANDS."

23  Q.   AND WHEN IT SAYS, "THE DEFENDANT," WHO IS THAT

24  REFERRING TO?

25  A.   MR. MARIANI.

1    THE COURT:  ANYTHING FURTHER, MR. DITTOE?

2    MR. DITTOE:  NO, SIR.

3    THE COURT:  DO YOU WANT TO EXAMINE ON THOSE

4    POINTS?

5    MR. ZIMET:  YES, SIR.

6    THE COURT:  GO AHEAD.

7    **RECROSS EXAMINATION**

8    BY MR. ZIMET:

9    Q.    NUMBER ONE, THAT PSI LED TO A SENTENCING, IS THAT

10   CORRECT?

11   A.    I'M SORRY?

12   Q.    THE PSI THAT YOU JUST READ FROM, THAT WAS --

13   A.    YES.

14   Q.    -- PRIOR TO THE TIME OF HIS SENTENCING, ISN'T THAT

15   CORRECT?

16   A.    YES.

17   Q.    AND MR. MARIANI TESTIFIED AT THAT SENTENCING, DID HE

18   NOT?

19   A.    YES.

20   Q.    AND MR. MARIANI TESTIFIED AT THAT SENTENCING CONCERNING

21   THE ISSUE OF WHETHER HE KNOWINGLY CREATED A RISK OF INJURY

22   TO OTHER PEOPLE, ISN'T THAT CORRECT?

23   A.    I'M NOT SURE.  I WASN'T THERE.

24   Q.    WELL, YOU WEREN'T THERE FOR THE PSI EITHER BUT YOU

25   TESTIFIED TO THAT, CORRECT?

```
 1  A.    CORRECT.

 2              MR. DITTOE:  OBJECTION, YOUR HONOR.

 3  ARGUMENTATIVE.

 4              THE COURT:  IT IS OVERRULED.

 5  BY MR. ZIMET:

 6  Q.    AND ISN'T IT CORRECT THE JUDGE AFTER MR. MARIANI'S

 7  TESTIMONY MADE A FINDING THAT MR. MARIANI IN FACT SHOULD NOT

 8  RECEIVE AN INCREASED SENTENCE BECAUSE THERE WAS NOT PROOF

 9  THAT IN FACT HE KNOWINGLY CREATED A SUBSTANTIAL RISK OF

10  BODILY HARM TO OTHER PEOPLE.

11  A.    I'M NOT SURE.

12  Q.    WELL, ISN'T IT CORRECT THAT A JUDICIAL FINDING IS MUCH

13  MORE SIGNIFICANT TO YOU AS AN INVESTIGATOR THAN A MERE

14  ALLEGATION IN THE PSI?

15  A.    YES, IT WOULD BE.

16              MR. DITTOE:  OBJECTION.  ASKED AND ANSWERED,

17  JUDGE.

18              THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

19  BY MR. ZIMET:

20  Q.    NOW, IN ADDITION TO THAT THE REFERENCE TO MR. PERKINS

21  FROM THE 302 THAT YOU READ FROM, DO YOU HAVE THAT IN FRONT

22  OF YOU?

23  A.    NO, SIR.

24              MR. ZIMET:  COULD I USE YOURS?

25              MR. DITTOE:  SURE.
```

```
 1   BY MR. ZIMET:

 2   Q.    ISN'T IT CORRECT IN THE BEGINNING OF THE SECOND

 3   PARAGRAPH ON PAGE TWO IT STATES, "IN APPROXIMATELY JANUARY

 4   OF 2000 MARIANI BEGAN RESIDING WITH PERKINS FULL TIME."

 5   A.    THE SECOND PARAGRAPH?

 6   Q.    YES, ON PAGE TWO.

 7   A.    YES, I SEE THAT.

 8   Q.    AND IT ALSO SAID THAT MARIANI PAID PERKINS $300 A MONTH

 9   IN RENT, ISN'T THAT CORRECT?

10   A.    CORRECT.

11   Q.    AND MARIANI WOULD PAY PERKINS FOR RENT EITHER IN CASH

12   OR WORKING WITH PERKINS INSTALLING WALL PAPER.

13   A.    CORRECT.

14   Q.    AND IN MARCH OF 2000 MR. PERKINS HAD OPEN HEART SURGERY

15   AND MR. MARIANI ASSISTED PERKINS' RECOVERY AFTER PERKINS

16   CAME HOME FROM THE HOSPITAL.

17   A.    CORRECT.

18   Q.    AND DURING THIS TIME MARIANI RESIDED WITH PERKINS,

19   MARIANI RECEIVED TELEPHONE CALLS AT PERKINS' RESIDENCE FROM

20   HIS PARENTS AND INDIVIDUALS INVOLVING MARIANI'S

21   TELEMARKETING BUSINESS, CORRECT?

22   A.    CORRECT.

23   Q.    AND --

24           MR. DITTOE:  YOUR HONOR, I OBJECT TO RELEVANCE.

25   IT IS WAY BEYOND THE SCOPE OF MY CROSS-EXAMINATION.
```

1              THE COURT:  I THINK IT ALL GOES TO THE ISSUE

2   WHETHER HE REPRESENTS A RISK OF FLIGHT.  I AM GOING TO

3   PERMIT IT.

4              OVERRULED.

5   BY MR. ZIMET:

6   Q.   AND ISN'T IT CORRECT THAT MR. MARIANI, WHEN YOU SPOKE

7   WITH HIM, YOU ASKED HIM WHETHER OR NOT HE THOUGHT ON THE

8   ULTIMATE QUESTION THAT MR. MARIANI WOULD LEAVE, THAT YOU

9   SPOKE WITH MR. MARIANI -- EXCUSE ME, THAT YOU SPOKE TO

10  MR. PERKINS CONCERNING THE ISSUE WHETHER MR. MARIANI WOULD

11  LEAVE OR NOT.

12             THE COURT:  WELL, EVEN IF HE DID MAKE THAT

13  EXPRESSION ULTIMATELY IT IS UP TO ME TO DECIDE WHETHER HE

14  REPRESENTS A RISK OF FLIGHT.

15             MR. ZIMET:  I UNDERSTAND.

16             THE COURT:  SO THAT'S ANOTHER FACTOR I MIGHT

17  CONSIDER.

18             MR. ZIMET:  I UNDERSTAND.

19             THE COURT:  GO AHEAD.

20  BY MR. ZIMET:

21  Q.   NOW, YOU ALSO BECAME AWARE THAT MR. MARIANI HIMSELF WAS

22  IN THE HOSPITAL, IS THAT CORRECT?

23             MR. DITTOE:  OBJECTION, JUDGE.  THIS IS WAY BEYOND

24  THE SCOPE OF --

25             THE COURT:  IT IS.  I WILL SUSTAIN THE OBJECTION.

```
 1              MR. ZIMET:  I HAVE NO OTHER QUESTIONS.

 2              THE COURT:  ALL RIGHT.  YOU CAN STEP DOWN.

 3              THANK YOU, MA'AM.

 4              DOES THE GOVERNMENT HAVE ANY FURTHER TESTIMONY TO

 5    OFFER?

 6              MR. DITTOE:  NO, SIR.

 7              I HAVE ADDITIONAL DOCUMENTS TO OFFER.

 8              THE COURT:  WHAT ARE THE DOCUMENTS?

 9              MR. DITTOE:  THE DOCUMENTS SIMPLY BE THE

10    MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING THE

11    DEFENDANT'S SUPERVISED RELEASE.  THERE WAS A HEARING HELD IN

12    FRONT OF THE MAGISTRATE, AS WELL AS THE PROBATION OFFICER

13    CHARGES CONCERNING THE NATURE OF THE SUPERVISED RELEASE

14    VIOLATIONS WHICH INCLUDED A FINDING THAT THE DEFENDANT FLED

15    BECAUSE THE DEFENDANT ADMITTED AND PLED GUILTY TO THAT.

16              THE COURT:  WAS THERE AN ADJUDICATION ON THESE

17    ALLEGED VIOLATION OF SUPERVISED RELEASE?

18              MR. DITTOE:  YES, THERE HAS, YOUR HONOR, AND THAT

19    WAS -- THE MAGISTRATE'S REPORT AND RECOMMENDATION WAS

20    AFFIRMED BY JUDGE PAINE, AND I WOULD LIKE TO OFFER THAT.

21              THE COURT:  I WILL RECEIVE THOSE IN EVIDENCE.

22              ANYTHING FURTHER FROM THE GOVERNMENT?

23              MR. DITTOE:  NO, SIR.

24              THE COURT:  ALL RIGHT.  MR. ZIMET?

25              MR. ZIMET:  JUDGE, I CALL MR. MARIANI.
```

1          THE COURT:  ALL RIGHT.

2          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

3          THE WITNESS:  SHALL I STAND?

4          THE CLERK:  DO YOU SOLEMNLY SWEAR TO TELL THE

5  TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP

6  YOU GOD?

7          THE WITNESS:  I DO.

8          THE CLERK:  WOULD YOU PLEASE HAVE A SEAT.

9          WOULD YOU PLEASE STATE YOUR NAME FOR THE RECORD.

10          THE WITNESS:  MY NAME NICK MARIANI, M-A-R-I-A-N-I.

11          THE CLERK:  THANK YOU.

12              **NICOLO MARIANI**,

13  BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

14              **DIRECT EXAMINATION**

15  BY MR. ZIMET:

16  Q.   MR. MARIANI, I AM NOT GOING TO GET INTO ANYTHING THAT

17  RELATES TO THE SUBSTANCE OF THE CHARGES AGAINST YOU DURING

18  MY DIRECT QUESTIONS, AND I WILL INSTRUCT YOU THAT IF YOU ARE

19  ASKED QUESTIONS RELATING TO THE SUBSTANCE OF THE CASE I WILL

20  INSTRUCT YOU TO ASSERT YOUR FIFTH AMENDMENT PRIVILEGE, DO

21  YOU UNDERSTAND THAT?

22  A.   I UNDERSTAND.

23          MR. DITTOE:  I OBJECT TO THAT, BECAUSE I -- THE

24  SCOPE OF THE DEFENDANT'S TESTIMONY IS GOING TO HAVE TO

25  RELATE TO THE -- SOMETHING TO DO WITH THIS CASE, AND PART OF

1   THAT WOULD INVOLVE THE STRENGTH OF THE GOVERNMENT'S CASE.

2           THE COURT:  WELL, MR. DITTOE, I WOULD ASSUME THAT

3   COUNSEL IS GOING TO ASK HIM FACTS TOUCHING UPON HIS

4   CREDIBILITY WITH REGARD TO RISK OF FLIGHT, AND I WOULD

5   ASSUME THAT HE IS STUDIOUSLY GOING TO AVOID QUESTIONING HIM

6   ABOUT ANY FACTS OF THE CASE AS SET FORTH IN THE INDICTMENT.

7           IS THAT CORRECT?

8           MR. ZIMET:  YES, SIR.

9           THE COURT:  IF, IN FACT, YOU DO, HOWEVER, IT IS

10  FAIR GAME FOR THE GOVERNMENT TO EXPLORE, YOU UNDERSTAND

11  THAT.

12          MR. ZIMET:  I UNDERSTAND, AND I AM ALSO GOING TO

13  INSTRUCT MY CLIENT APPROPRIATELY.

14          THE COURT:  ALL RIGHT.  LET'S GO AHEAD.

15  BY MR. ZIMET:

16  Q.   NOW, SIR, YOU WERE ASKED, OR YOU HEARD THE PROFFER AND

17  ALSO THE TESTIMONY OF THE FBI AGENT CONCERNING EVENTS WHICH

18  OCCURRED IN THE PAST INVOLVING YOUR CRIMINAL ACTIVITY, IS

19  THAT CORRECT?

20  A.   YES, SIR.

21  Q.   AND YOU HEARD HER TESTIMONY CONCERNING THE SENTENCING

22  PROCEDURE IN THE ARSON CASE WHICH TOOK PLACE RELATING TO

23  YOUR STORE, IS THAT CORRECT?

24  A.   YES.

25  Q.   WAS HER REPRESENTATIONS COMPLETE AND CORRECT?

1   A.    NO.

2   Q.    WHAT WAS INCORRECT?

3   A.    THE FACT --

4            MR. DITTOE:  JUDGE, I OBJECT TO THE FORM OF THE

5   QUESTION WITH REGARD TO THE AGENT'S REPRESENTATIONS.  THE

6   AGENT READ FROM THE PRESENTENCE INVESTIGATION.

7            THE COURT:  WELL, HE IS ASKING HIM WHETHER THERE

8   WERE ANY INCORRECT REPRESENTATIONS.

9            I WILL PERMIT THAT.  OVERRULED.

10  BY MR. ZIMET:

11  Q.    WERE THEY COMPLETE?  GO AHEAD.

12  A.    NO, THEY WERE NOT.

13  Q.    WOULD YOU ELABORATE WHY THEY WERE NOT COMPLETE.

14  A.    BECAUSE AT MY SENTENCING I TOOK THE STAND AND TESTIFIED

15  ON MY BEHALF, AND WHEN THE PROSECUTOR ASKED ME WHAT MY

16  MOTIVE WAS IN LIGHTING THE FIRE I SAID IT WAS TO COLLECT THE

17  INSURANCE MONIES AND THAT I DID NOT LIGHT THE FIRE MYSELF

18  BUT THAT I PAID SOMEBODY TO DO IT.

19  Q.    OKAY.  AND WAS THE ISSUE AT THE SENTENCING WHETHER YOU

20  KNOWINGLY CAUSED SERIOUS BODILY HARM TO OTHER PEOPLE?

21  A.    YES, IT WAS.

22  Q.    AND WHAT WAS THE JUDGE'S ULTIMATE FINDING CONCERNING

23  THAT ISSUE?

24  A.    THE PSI RECOMMENDED A 71-MONTH SENTENCE, AND THE

25  GOVERNMENT FAILED TO PROVE THAT I KNOWINGLY CREATED THIS

```
 1   RISK.  THE FACT THAT I LIT THE FIRE -- I TOLD THE MAN TO
 2   LIGHT THE FIRE AT FOUR A.M. SO THAT NOBODY WOULD BE HURT, MY
 3   BUILDING WOULD BE VACANT, THE JUDGE GAVE ME A 46-MONTH
 4   SENTENCE INSTEAD OF THE PSI RECOMMENDATION OF 71.
 5   Q.   NOW, IN ADDITION TO THAT THERE HAVE BEEN A SERIES OF
 6   QUESTIONS SUGGESTING THAT YOU INFORMED THE FBI THAT YOU
 7   KNOWINGLY WERE GOING TO BE LEAVING THE AREA ON FRIDAY SO
 8   THAT YOU WOULDN'T BE ARRESTED, DO YOU RECALL THOSE
 9   REPRESENTATIONS?
10   A.   I DO.
11   Q.   WERE THEY CORRECT?
12   A.   NO, THEY WERE NOT.
13   Q.   TELL THE JUDGE WHAT WAS ACTUALLY SAID.
14   A.   JUDGE, WHAT I SAID TO THE AGENT WHO ARRESTED ME -- AND
15   I HAVE BEEN ARRESTED BEFORE.  MY CRIMINAL RECORD SHOWS.  I
16   ALWAYS EXERCISE MY MIRANDA.  I DON'T WAIVE THEM.  I KEEP MY
17   MOUTH SHUT AND I HIRE AN ATTORNEY.
18           THE ONLY THING I DID SAY WAS, "WHAT ARE YOU GUYS
19   DOING HERE ON A TUESDAY INSTEAD OF FRIDAY?  LIKE IN THE
20   MOVIES ALL YOU FBI GUYS COME ON FRIDAY."
21           AND EVERY FRIDAY FOR THE PAST THREE MONTHS I HAVE
22   BEEN SHAVING, SHOWERING, AND SITTING ON THE COUCH AND
23   WATCHING THE NEWS WAITING FOR THEM TO COME AT FIVE A.M. AND
24   I HAVE BEEN PREPARING FOR THEM.
25   Q.   AND WAS THAT AT MR. PERKINS' HOUSE?
```

```
 1   A.    THAT WAS IN MR. PERKINS' HOUSE.

 2   Q.    LET'S TALK ABOUT MR. PERKINS.

 3              WAS THE PART THAT I READ FROM THE 302 ABOUT YOU

 4   LIVING THERE SINCE JANUARY ACCURATE?

 5   A.    I WAS LIVING THERE FOR A LITTLE OVER A YEAR AT THE TIME

 6   OF MY ARREST.

 7   Q.    NOW, ALSO DURING THAT TIME PERIOD, ACCORDING TO THE

 8   GOVERNMENT, THAT YOU BECAME AWARE OF THE FACT THAT YOU WERE

 9   LIKELY TO BE INDICTED, IS THAT CORRECT?

10   A.    I WAS RELEASED FROM PRISON IN DECEMBER OF '98, AND I

11   KNEW ABOUT THE INVESTIGATION THE FIRST DAY.

12   Q.    NOW, FROM THAT KNOWLEDGE, ALL RIGHT, YOU -- YOU HAD THE

13   ABILITY IF YOU HAD WANTED TO, TO LEAVE THE DISTRICT, IS THAT

14   CORRECT?

15   A.    YES.  I HAD TWO MONTHS STATE PROBATION WHICH I

16   COMPLETED AND I WAS FREE TO COME AND GO AS I PLEASE AFTER

17   THAT.

18   Q.    SO AS OF THE SPRING OF 1999 YOU ARE FREE TO GO ANYWHERE

19   YOU WANTED TO?

20   A.    ANYWHERE.  AND, IN FACT, I HAD A TRIP PLANNED WITH MY

21   MOM TO GO TO ITALY.  I APPLIED FOR A PASSPORT, AND WHEN I

22   KNEW ABOUT THE INDICTMENT I DIDN'T WANT TO GO.  I DIDN'T

23   WANT TO RISK BEING ARRESTED, YOU KNOW, COMING AND LEAVING OR

24   GOD FORBID HAVING TO LEAVE MY MOTHER IN EUROPE AND FOR HER

25   TO HAVE HER MAKE HER WAY BACK BY HERSELF.
```

35

```
 1              MR. ZIMET:  MAY I APPROACH, JUDGE?

 2              THE COURT:  YOU MAY.

 3   BY MR. ZIMET:

 4   Q.   IS THIS THE PASSPORT YOU ARE REFERRING TO, SIR, THAT

 5   I'M HAND YOU?

 6   A.   YES.  AND, AS YOU CAN SEE IT'S NEVER BEEN STAMPED.  I

 7   NEVER USED IT.

 8   Q.   AND IS THAT A PASSPORT YOU GOT IN YOUR OWN NAME?

 9   A.   IN MY NAME.

10   Q.   OKAY.  AND HAVE YOU TRIED TO GET ANY KIND OF TRAVELING

11   DOCUMENTS IN ANY OTHER NAMES SINCE THE TIME OF YOUR RELEASE

12   FROM FEDERAL PRISON?

13   A.   NO, SIR.

14   Q.   NOW, IN ADDITION TO THAT, YOU -- THE AGENT TESTIFIED

15   THAT YOU HAD A GIRLFRIEND OR FIANCEE, IS THAT CORRECT?

16   A.   I HAVE.

17   Q.   AND WHAT IS HER NAME?

18   A.   HER NAME IS GILVANT MACHATTO.

19   Q.   AND IS SHE PRESENT IN COURT?

20   A.   SHE IS HERE.

21   Q.   AND HAVE YOU BEEN SPENDING TIME WITH HER SINCE THE TIME

22   OF YOUR RELEASE FROM PRISON?

23   A.   YES, I HAVE.

24   Q.   AND DOES SHE ANY CHILDREN?

25   A.   SHE HAS TWO.
```

1  Q.    AND WHAT WAS YOUR INVOLVEMENT WITH THOSE CHILDREN, SIR?

2  A.    I PROVIDED FOR HER AND HER CHILDREN.

3  Q.    OKAY.  AND ARE YOU PLANNING TO CONTINUE TO DO THAT IF

4  YOU ARE RELEASED?

5  A.    I WOULD HAVE BEEN MARRIED NOW IF I WASN'T ARRESTED.

6  Q.    AND DURING THE TIME PERIOD OF BEING INVOLVED WITH HER

7  HAVE YOU BEEN INVOLVED IN THE CHILDREN FROM THE STANDPOINT

8  OF ASSISTING RAISING THE CHILDREN?

9  A.    YES, I HAVE.  I ATTENDED SEVERAL PARENT/TEACHER

10  CONFERENCE MEETINGS AT BAYVIEW ELEMENTARY WITH THE CHILDRENS

11  TEACHERS.

12  Q.    AND WOULD THOSE HAVE BEEN IN THE SPRING OF THE YEAR

13  2000?

14  A.    YES.

15        MR. ZIMET:  MAY I APPROACH, JUDGE?

16        THE COURT:  YOU MAY.

17  BY MR. ZIMET:

18  Q.    WHAT IS THAT DOCUMENT I PRESENTED TO YOU, SIR?

19        MR. ZIMET:  I WILL MARK THESE AT THE END OF THE

20  HEARING, JUDGE.

21        THE WITNESS:  THIS IS A LETTER FROM PAMALA, THE

22  DAUGHTER OF MY FIANCEE, THE EIGHT YEAR OLD DAUGHTER.  THIS

23  IS THE LETTER FROM NANCY ZLOCH, I BELIEVE A FEDERAL JUDGE'S

24  WIFE, NANCY ZLOCH, AND IT SAYS HERE THAT I ATTENDED

25  PARENT/TEACHER CONFERENCE MEETINGS WITH HER AND THAT

```
 1   PAMALA'S PROGRESS HAS BEEN BETTER THIS YEAR AND THAT I HELP

 2   HER WITH HER SCHOOL WORK AND THAT SHE IS A LOVELY YOUNG

 3   GIRL.

 4   Q.    NOW, IN ADDITION TO THAT, SIR, YOU HAD SOME MEDICAL

 5   PROBLEMS YOURSELF, IS THAT CORRECT?

 6   A.    YES, IN FEBRUARY.

 7   Q.    AND THAT WAS -- RESULTED IN YOU BEING HOSPITALIZED, IS

 8   THAT CORRECT?

 9   A.    YES, AT THE CLEVELAND CLINIC IN FORT LAUDERDALE.

10   Q.    AND YOU COULD HAVE USED AN ASSUMED NAME OR A DIFFERENT

11   NAME OR ALL THESE ALIASES THEY ARE CLAIMING THAT YOU ARE

12   INVOLVED WITH, IS THAT --

13   A.    NO, I USED MY REAL NAME WHEN I WENT TO THE HOSPITAL.

14            MR. ZIMET:  IF I CAN APPROACH?

15            THE COURT:  YOU MAY.

16            MR. DITTOE:  YOUR HONOR, MAY I SEE THESE FIRST?

17            MR. ZIMET:  SURE.

18   BY MR. ZIMET:

19   Q.    AND THE DOCUMENT I HAVE HANDED TO YOU IS THAT A

20   DOCUMENT THAT YOU RECEIVED AS PART OF YOUR TREATMENT AT THE

21   CLEVELAND CLINIC IN FORT LAUDERDALE, IS THAT CORRECT?

22   A.    YEAH, ON FEBRUARY 15 I WAS -- I WENT TO THE EMERGENCY

23   ROOM FOR A RUPTURED HERNIA.

24   Q.    AND YOU COULD HAVE LEFT THE DISTRICT, LEFT THE UNITED

25   STATES WHENEVER YOU WANTED TO AT THAT POINT, IS THAT
```

```
 1   CORRECT?

 2   A.    OF COURSE.

 3              MR. DITTOE:  OBJECTION.  LEADING.

 4              THE COURT:  OVERRULED.

 5   BY MR. ZIMET:

 6   Q.    NOW, SIR, IN ADDITION YOUR PARENTS ARE PRESENT IN

 7   COURT, IS THAT CORRECT?

 8   A.    THEY ARE HERE.

 9   Q.    AND THEY RESIDE WHERE?

10   A.    IN NEW YORK.

11   Q.    AND THEY ARE WILLING TO PLEDGED PROPERTY, THAT IS,

12   THEIR RESIDENCE IN NEW YORK FOR YOUR BOND, IS THAT CORRECT?

13   A.    THAT'S CORRECT.

14   Q.    AND, IN FACT, THE VALUE IS SOMEWHERE AROUND $200,000 TO

15   YOUR UNDERSTANDING, IS THAT CORRECT?

16   A.    THAT'S CORRECT.

17   Q.    AND PRIOR TO THE TIME OF YOU BEING ARRESTED, DID YOU

18   HAVE DISCUSSIONS WITH YOUR FAMILY CONCERNING THE FACT THAT

19   YOU KNEW THAT YOU WERE GOING TO BE ARRESTED?

20   A.    MY FATHER WAS HERE IN FEBRUARY.  I THINK HE WAS -- AND

21   THEN MY MOTHER CAME IN MARCH.  THEY WERE HERE ON VACATION,

22   AND WHILE THEY WERE HERE I TOLD THEM ABOUT IT.  AND I, YOU

23   KNOW, SAID THAT SOMETHING THAT HAPPENED IN 1995.

24   Q.    WELL, LET'S NOT GO INTO THE SUBSTANCE --

25   A.    YEAH.
```

```
 1   Q.    -- OF WHAT THE CASE IS.  LET'S TALK ABOUT WHAT YOU

 2   DISCUSSED WITH THEM CONCERNING WHETHER OR NOT YOU ARE GOING

 3   TO STAY HERE, FACE THE CHARGES OR YOU ARE NOT GOING TO DO

 4   THAT.

 5   A.    YEAH, OF COURSE, I TOLD THEM I WAS GOING TO STAY HERE

 6   AND FACE IT AND I WAS MAKING PREPARATIONS FOR IT.

 7   Q.    OKAY.  NOW, IN THE EVENT THAT THE JUDGE RELEASED YOU ON

 8   CONDITIONS OF BOND WOULD YOU BE AGREEABLE TO CONDITIONS SUCH

 9   AS ELECTRONIC MONITORING IF THE JUDGE VIEWED THAT AS BEING A

10   VIABLE CONDITION OF BOND?

11   A.    OF COURSE.

12   Q.    AND DURING THE TIME PERIOD -- OH, SINCE THE TIME OF THE

13   MAY 31ST HEARING HAS THERE BEEN A STATUS HEARING AND A TRIAL

14   SETTING OF THIS CASE?

15   A.    YES, THERE HAS.

16   Q.    AND WHEN IS THE TRIAL CURRENTLY SET FOR?

17             MR. DITTOE:  OBJECTION.

18             THE WITNESS:  I BELIEVE FEBRUARY --

19             THE COURT:  WHAT IS THE RELEVANCE OF THIS?

20             MR. ZIMET:  THE RELEVANCY, JUDGE, IS SO THE COURT

21   WILL BE AWARE IF HE IS OUT ON BOND THE TIME PERIOD THAT HE

22   WOULD BE OUT ON BOND, AND HOW LONG HE WOULD BE IF HE WASN'T

23   OUT ON BOND REMAIN INCARCERATED.

24             THE COURT:  I WILL SUSTAIN THE OBJECTION.

25   BY MR. ZIMET:
```

1   Q.   AND, TO YOUR KNOWLEDGE, SIR, HAVE THE OTHER

2   CODEFENDANTS IN THIS CASE BEEN RELEASED ON BOND?

3   A.   ALL OF THEM HAVE BEEN RELEASED ON BOND.

4           MR. DITTOE:  OBJECTION, YOUR HONOR.

5           THE COURT:  I SUSTAIN THE OBJECTION AS BEING

6   IRRELEVANT.

7           MR. ZIMET:  I HAVE NO OTHER QUESTIONS, JUDGE.

8           THE COURT:  ANY QUESTIONS, MR. DITTOE?

9           MR. DITTOE:  YES, I HAVE SOME, YOUR HONOR.

10              **CROSS EXAMINATION**

11  BY MR. DITTOE:

12  Q.   MR. MARIANI, YOU WERE, OF COURSE, CONVICTED OF THE

13  ARSON, IS THAT CORRECT?  THERE WAS A DISCUSSION --

14  A.   I PLED GUILTY.

15  Q.   AND YOU SERVED TIME FOR THAT, IS THAT CORRECT?

16  A.   THAT'S CORRECT.

17  Q.   AND YOU WERE PLACED ON SUPERVISED RELEASE FOLLOWING THE

18  YOUR RELEASE FROM INCARCERATION, IS THAT CORRECT, SIR?

19  A.   THAT'S CORRECT.

20  Q.   AND PART OF THE CONDITIONS OF YOUR SUPERVISED RELEASE

21  WAS THAT YOU WERE TO KEEP THE PROBATION OFFICE INFORMED OF

22  YOUR LOCATION, IS THAT CORRECT, SIR?

23  A.   THAT'S CORRECT.

24  Q.   AND ALSO PART OF YOUR CONDITIONS OF SUPERVISED RELEASE

25  WAS THAT YOU WERE TO -- YOU WERE REQUIRED TO INFORM YOUR

1    PROBATION OFFICER OF ANY ARRESTS, OR INDEED ANY QUESTIONING

2    BY LAW ENFORCEMENT OFFICERS, IS THAT CORRECT, SIR?

3    A.    THAT'S CORRECT.

4    Q.    NOW, YOU WERE CHARGED WITH VIOLATING THE CONDITIONS OF

5    YOUR SUPERVISED RELEASE, CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    I AM SHOWING YOU WHAT HAS BEEN MARKED FOR PURPOSES OF

8    IDENTIFICATION AS GOVERNMENT'S EXHIBIT NUMBER 5.

9          DO YOU RECALL SEEING THIS, PETITIONING THE COURT

10   CONCERNING THE VIOLATION OF YOUR SUPERVISED RELEASE?

11   A.    I HAVE A COPY OF IT.

12   Q.    NOW, SIR, I WOULD LIKE TO DIRECT YOUR ATTENTION TO

13   PARAGRAPHS 12, 13, AND 14 OF THAT CHARGE, IF YOU WILL.

14          NOW, PARAGRAPH 12 CHARGES YOU WITH FAILING TO

15   SUBMIT A TRUTHFUL AND COMPLETE MONTHLY REPORT TO YOUR

16   SUPERVISORY PROBATION OFFICER, IS THAT CORRECT?

17   A.    THAT'S CORRECT.

18   Q.    AND COUNT 13 CHARGES YOU WITH FAILING TO NOTIFY THE

19   PROBATION OFFICER OF ANY CHANGE OF YOUR RESIDENCE.  AND

20   SPECIFICALLY IT SAYS, "ON OR ABOUT JANUARY 1, 1996, THE

21   SUPERVISED RELEASEE," MEANING YOU, "MOVED FROM HIS APPROVED

22   RESIDENCE OF 3636 ALDER DRIVE, NUMBER F1, WEST PALM BEACH,

23   FLORIDA, AND HIS WHEREABOUTS IS UNKNOWN," IS THAT CORRECT,

24   SIR?

25   A.    THAT'S WHAT IT SAYS.

```
 1   Q.   AND FINALLY -- AND YOU ENTERED A GUILTY PLEA.  YOU

 2   ADMITTED YOUR GUILT WITH RESPECT TO THOSE TWO CHARGES, ISN'T

 3   THAT CORRECT?

 4   A.   I BELIEVE I PLED NO CONTEST TO THOSE CHARGES.

 5   Q.   AND SPECIFICALLY I WILL REFER YOUR ATTENTION TO WHAT

 6   HAS BEEN MARKED FOR PURPOSES OF IDENTIFICATION AS

 7   GOVERNMENT'S EXHIBIT NUMBER 6?

 8            THE COURT:  DO YOU HAVE A COPY FOR MR. ZIMET?

 9            MR. DITTOE:  YES, SIR, YOUR HONOR.

10   BY MR. DITTOE:

11   Q.   SPECIFICALLY ON GOVERNMENT EXHIBIT NUMBER 6, YOU ADMIT

12   VIOLATIONS ONE, NINE, 10, 11, 12, 13, AND 14, IS THAT

13   CORRECT?

14            THAT CORRECT, SIR?

15   A.   THAT'S WHAT IT SAYS.  THAT'S CORRECT.

16   Q.   SO YOU ADMITTED ESSENTIALLY LEAVING, AND THIS EVENT

17   HAPPENED AFTER YOU WERE CHARGED WITH PUNCHING MR. POSEY IN

18   THE PARKING LOT, IS THAT CORRECT, SIR?

19   A.   THAT'S CORRECT.

20   Q.   SO YOU ESSENTIALLY ADMITTED TO MAGISTRATE VITUNAC THAT

21   YOU FAILED TO REPORT THE PUNCHING OF MR. POSEY, IS THAT

22   CORRECT?

23   A.   THAT'S CORRECT.

24   Q.   AND THAT YOU THEN LEFT WHERE YOU WERE RESIDING AFTER

25   YOU PUNCHED MR. POSEY, IS THAT CORRECT?
```

```
 1  A.   YES, THAT'S CORRECT.

 2  Q.   NOW, DID YOU TURN YOURSELF IN TO THE MARSHALL'S OFFICE

 3  FOR THE VIOLATION OF YOUR SUPERVISED RELEASE?

 4  A.   NO, I DID NOT.

 5  Q.   YOU WERE ARRESTED, IS THAT CORRECT?

 6  A.   THAT'S CORRECT.

 7  Q.   NOW --

 8  A.   IN PALM BEACH COUNTY.

 9  Q.   BUT YOU WERE ARRESTED.

10  A.   THE SAME JURISDICTION THAT HAS MY PROBATION.

11  Q.   YOU CHANGED YOUR ADDRESS, IS THAT CORRECT, SIR?  YOU

12  MOVED, CORRECT?

13  A.   I MOVED.

14  Q.   AND HOW LONG WAS IT BEFORE YOU WERE ARRESTED, SIR?  IT

15  WAS SEVERAL MONTHS, CORRECT?

16  A.   YEAH, SEVERAL MONTHS.

17  Q.   AND MAGISTRATE VITUNAC DETERMINED THAT YOU TESTIFIED --

18  STRIKE THAT.

19        YOU TESTIFIED AT YOUR SUPERVISED RELEASE HEARING,

20  IS THAT CORRECT, SIR?

21  A.   YES, I DID.

22  Q.   AND MAGISTRATE JUDGE VITUNAC DETERMINED THAT YOU WERE

23  NOT A CREDIBLE WITNESS AT YOUR SUPERVISED RELEASE HEARING,

24  ISN'T THAT CORRECT, SIR?

25  A.   I DON'T REMEMBER.
```

1   Q.    MAGISTRATE JUDGE VITUNAC DECIDED THAT YOU HAD IN FACT

2   ENGAGED IN VIOLATIONS INVOLVING THE PUNCHING OF MR. POSEY

3   AND PRETENDING TO BE AN FBI TO GAIN ACCESS TO THE RESIDENCE

4   OF MR. CORDO, IS THAT CORRECT?

5   A.    I WAS VIOLATED.   IT WAS A MULTI-COUNT VIOLATION.

6   Q.    AND YOU WERE VIOLATED.

7   A.    I WAS VIOLATED AND I GOT 21 MONTHS FOR IT.

8   Q.    AND JUDGE VITUNAC REJECTED YOUR TESTIMONY, IS THAT

9   CORRECT?

10          MR. ZIMET:  JUDGE, I THINK HER REPORT AND

11  RECOMMENDATION SPEAKS FOR ITSELF.   IT IS IN EVIDENCE.   I

12  OBJECT.

13          MR. DITTOE:  NO FURTHER QUESTIONS.

14          MR. ZIMET:  NO REDIRECT, JUDGE.

15          THE COURT:  ALL RIGHT, SIR, YOU MAY STEP DOWN.

16          ANYTHING FURTHER FROM THE DEFENSE?

17          MR. ZIMET:  JUDGE, I WILL CALL MR. PERKINS.

18          THE COURT:  ALL RIGHT, MR. PERKINS COME FORWARD

19  AND BE SWORN.

20          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

21          DO YOU SOLEMNLY SWEAR TO TELL, THE TRUTH THE WHOLE

22  TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

23          THE WITNESS:  YES, I DO.

24          THE CLERK:  THANK YOU.  PLEASE HAVE A SEATED.

25          PLEASE STATE YOUR NAME FOR THE RECORD SPELLING

```
 1   YOUR LAST NAME.

 2          THE WITNESS:  ROBERT PERKINS, P-E-R-K-I-N-S.

 3                    ROBERT PERKINS,

 4   BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 5                    DIRECT EXAMINATION

 6   BY MR. ZIMET:

 7   Q.    SIR, WHERE DO YOU RESIDE?

 8   A.    FORT LAUDERDALE.

 9   Q.    HOW LONG HAVE YOU LIVED IN FORT LAUDERDALE?

10   A.    ALMOST 20 YEARS.

11   Q.    AND DO YOU KNOW MR. MARIANI?

12   A.    YES, SIR.

13   Q.    AND YOU HEARD EARLIER, I THINK YOU WERE PRESENT IN

14   COURT WHEN THERE WAS A DESCRIPTION OF YOU HAVING MR. MARIANI

15   LIVE AT YOUR HOUSE OR YOUR PLACE SINCE JANUARY OF THE YEAR

16   2000, IS THAT CORRECT?

17   A.    YES, SIR.

18   Q.    AND HAS MR. MARIANI PAID RENT AT THAT LOCATION?

19   A.    YES, SIR.

20   Q.    AND HAS HE ASSISTED YOU PERSONALLY IN ANY WAY DURING

21   THAT TIME PERIOD?

22   A.    YES, HE HAS.  I WAS ON DEATH'S DOORSTEP.  I HAD THREE

23   MONTHS TO LIVE.  I HAD A BAD HEART PROBLEM, AND MR. MARIANI

24   BASICALLY NURSED ME BACK TO LIFE IS WHAT HE DID.

25   Q.    AND WHEN WAS THE OPERATION OR THE PROCEDURE YOU ARE
```

1  DESCRIBING TO THE COURT?

2  A.   I HAD A HEART PROBLEM IN FEBRUARY ON MY BIRTHDAY.  I

3  ENTERED THE HOSPITAL ON THE 19TH, AND TWO DAYS LATER I WAS

4  TOLD I HAD THREE MONTHS TO LIVE.  I HAD TO HAVE A VALVE

5  REPLACEMENT.  AND IT TOOK ABOUT THREE WEEKS FOR THE

6  OPERATION TO TAKE PLACE AND I HAD THE OPERATION, IT WAS VERY

7  SUCCESSFUL.

8  Q.   AND WHERE WAS MR. MARIANI DURING ALL THIS TIME PERIOD?

9  A.   HE WAS AT MY HOUSE TAKING CARE OF MY BUSINESS, MY WALL

10  PAPER BUSINESS, MAKING PAYROLL, DOING CHECKS, DOING MY

11  LAUNDRY, FEEDING ME.  I MEAN, THE GUY JUST BASICALLY NURSED

12  ME BACK TO LIFE.

13  Q.   AND WHEN YOU RETURNED HOME AFTER THE PROCEDURE WHERE

14  WAS MR. MARIANI?

15  A.   HE WAS AT MY HOUSE.  I COULDN'T -- THEY WOULDN'T HAVE

16  LET ME OUT OF THE HOSPITAL UNLESS SOMEONE WAS THERE.  I HAVE

17  NO FAMILY OR FRIENDS HERE.

18  Q.   OKAY.

19  A.   AND HE STEPPED FORWARD AND --

20  Q.   AND DURING THE TIME PERIOD THAT MR. MARIANI WAS AT YOUR

21  HOUSE DID YOU BECOME AWARE THAT HE BELIEVED HE WAS FACING

22  CHARGES?

23  A.   YES, I DID.  WE WOULD SIT DOWN AND DISCUSS IT OUTSIDE

24  ON MY PATIO.  HE HAD AMPLE CHANCE TO LEAVE BUT HE DECIDED TO

25  STAY.

1    Q.    AND DID HE FOLLOW ANY KIND OF PROCEDURE OR ANY KIND OF

2    HABIT ON FRIDAYS CONCERNING HIS BEING ARRESTED?

3    A.    HE WOULD SIT AND WAIT FOR THEM.  HE ACTUALLY HAD A BAG

4    PACKED BECAUSE HE KNEW HE NEEDED A SUIT AND TIE FOR COURT.

5    HE HAD ONE ALL SET TO GO AND I WAS SUPPOSED TO BRING IT WHEN

6    HE GOT ARRESTED, AND THAT WAS THE PLAN.

7    Q.    AND WHERE WAS HE ON FRIDAYS?  WAS HE AT YOUR HOUSE

8    OR --

9    A.    HE WAS AT MY HOUSE WAITING FOR THEM.

10   Q.    AND THE DESCRIPTION THAT HE WOULD GO FROM PLACE TO

11   PLACE ON FRIDAYS TO AVOID BEING ARRESTED ON FRIDAYS DURING

12   THE TIME PERIOD HE LIVED WITH YOU, WAS THAT CORRECT OR

13   INCORRECT?

14   A.    I DON'T KNOW WHERE THEY GOT THAT FROM, BUT THE MAN WAS

15   LITERALLY AT MY HOUSE.  HE COULDN'T LEAVE BECAUSE I WAS

16   SICK.  HE HAD TO BE AT MY HOUSE.

17   Q.    DID HE EVER TELL YOU DURING THE TIME PERIOD THAT YOU

18   WERE SICK, "I'M REALLY SORRY THAT YOU ARE ILL," OR WORDS TO

19   THAT EFFECT, "BUT I HAVE TO LEAVE BECAUSE I HAVE TO TAKE

20   CARE OF MYSELF," OR ANYTHING LIKE THAT?

21   A.    NO, NOT AT ALL.  WE HAD TALKED AND HE DECIDED HE WAS

22   GOING TO STAY AND GET IT ALL BEHIND HIM.

23            MR. ZIMET:  I HAVE NO OTHER QUESTIONS.

24            THE COURT:  MR. DITTOE, DO YOU HAVE ANY QUESTIONS?

25            MR. DITTOE:  SOME QUESTIONS, YES, YOUR HONOR.

1          <u>CROSS EXAMINATION</u>

2    BY MR. DITTOE:

3    Q.   MR. PERKINS --

4    A.   YES, SIR.

5    Q.   -- YOU WOULD DESCRIBE YOURSELF OBVIOUSLY AS A FRIEND OF

6    THE DEFENDANT, IS THAT CORRECT?

7    A.   YES, SIR.

8    Q.   AND, OF COURSE, YOU WOULD NOT HAVE ANY KNOWLEDGE

9    CONCERNING THE DEFENDANT'S ACTIONS BEFORE YOU CAME TO KNOW

10   HIM, OR BEFORE HE CAME TO BE YOUR FRIEND.

11   A.   EVERYTHING I HEAR TODAY IS ALL NEWS TO ME.  I HAD NO

12   IDEA AS TO WHAT TOOK PLACE.

13   Q.   NOW, YOU DID TELL THE FBI AGENTS, THOUGH, DID YOU NOT,

14   THAT HE -- CONCERNING YOUR FRIEND, MR. MARIANI, THAT HE

15   WANTED TO BE A TOUGH GUY AND HE WOULD ACT AND BE PRETTY

16   INTIMIDATING AND HAD A NEW YORK KIND OF ATTITUDE.

17   A.   WELL, THAT WAS KIND OF TAKEN OUT OF CONTEXT.  WE WERE

18   TALKING ABOUT ITALIANS BEING STEREOTYPED WITH THE TELEVISION

19   PROGRAMS AND THE GODFATHER, AND SO FORTH, AND WE WERE

20   TALKING ABOUT THAT, AND I THINK IT IS CORRECT.  ANY TYPE OF

21   ITALIANS SEEM TO BE -- PEOPLE LOOK AT THEM AS TOUGH GUYS,

22   AND THAT WAS THE CONTEXT WE WERE TALKING WITH THE FBI

23   AGENTS.

24   Q.   WELL, YOU DID SAY THAT CONCERNING MR. MARIANI.  I DON'T

25   KNOW IF IT WAS THE CONTEXT IN WHICH THE CONVERSATION WAS

```
 1  MADE, BUT YOU DID --

 2  A.   WELL, WE WERE TALKING ABOUT ITALIANS IN GENERAL.  NOT

 3  MR. MARIANI IN GENERAL, JUST THE GROUP OF ITALIAN PEOPLE

 4  ALTOGETHER.  THEY TEND TO BE TOUGH GUYS AND THEY ARE

 5  INTIMIDATING IN THE WAY THEY TALK AND WALK.  YOU ASSUME THEY

 6  ARE SOMEHOW INVOLVED WITH SOMETHING EVEN THOUGH THEY MAY NOT

 7  BE.

 8  Q.   AND WAS THAT IN CONNECTION WITH THE DISCUSSION

 9  CONCERNING MR. MARIANI, THOUGH?  I MEAN, YOU WEREN'T TALKING

10  WITH THE FBI AGENTS JUST ABOUT ITALIAN AMERICANS GENERALLY?

11  A.   WELL, NO, IT WAS A DISCUSSION THAT WE WERE -- IT JUST

12  HEADED THAT WAY AND I ENDED UP SAYING THAT, BECAUSE I THINK

13  IT IS TRUE.

14  Q.   AND THAT WOULD BE TRUE WITH RESPECT TO MR. MARIANI AS

15  WELL.

16  A.   AGAIN, I HAVE NEVER SEEN MR. MARIANI TRYING TO BE A

17  TOUGH GUY IN THE SEVEN YEARS THAT I HAVE KNOWN HIM.  ALL OF

18  THIS WHAT'S HAPPENING TODAY IS ALL NEW TO ME.  I HAD NO IDEA

19  ANY OF THIS EXISTED.

20          MR. DITTOE:  NO FURTHER QUESTIONS, YOUR HONOR.

21          THE COURT:  ALL RIGHT.

22          MR. ZIMET:  NO REDIRECT.

23          THE COURT:  THANK YOU.  YOU CAN STEP DOWN.

24          ANYTHING FURTHER?

25          MR. ZIMET:  I HAVE NO OTHER WITNESSES, JUDGE.
```

1          THE COURT:  ALL RIGHT.  LET ME HEAR A BRIEF

2   STATEMENTS, VERY BRIEF BEING THE KEY WORD, STATEMENT FROM

3   COUNSEL.

4          MR. DITTOE:  YES, YOUR HONOR, I UNDERSTAND.

5          THE DEFENDANT'S PRESENTENCE INVESTIGATION REFLECTS

6   THAT HE HAS A DEMONSTRATED HISTORY OF VIOLENCE, THAT HE HAS

7   VIOLATED THE COURT ORDER ON NUMEROUS OCCASIONS.  JUDGE

8   VITUNAC IN HER REPORT AND RECOMMENDATION, WHICH IS

9   GOVERNMENT'S EXHIBIT NUMBER 6, FOUND THAT THE DEFENDANT

10  ENGAGED IN TWO SEPARATE ACTS OF VIOLENCE WHILE HE WAS ON

11  SUPERVISED RELEASE, AND THE DEFENDANT ADMITTED TO HAVING

12  FLED IN RESPONSE TO THE CHARGE CONCERNING HIS SUPERVISED

13  RELEASE VIOLATION.

14         THEREFORE, YOUR HONOR, THE UNITED STATES HAS

15  ESTABLISHED BOTH THE -- BY CLEAR AND CONVINCING EVIDENCE THE

16  DANGER TO THE COMMUNITY, GIVEN THIS DEFENDANT'S PRIOR

17  HISTORY IN COMMITTING THE COMMISSION OF VIOLENCE ON

18  SUPERVISED RELEASE, AND ALSO THE FLIGHTS RISKS.  THERE ARE

19  NO CONDITIONS THAT WOULD REASONABLY ASSURE THE DEFENDANT'S

20  APPEARANCE.

21         THE FACT THAT THE DEFENDANT ENGAGED IN CERTAIN

22  ACTIONS THAT WOULD BE CONSISTENT WITH APPEARING AT TRIAL

23  DOES NOT CHANGE THE FACT THAT HE IN FACT DID NOT APPEAR

24  BEFORE IN COURT AND WOULD HAVE THE MEANS AVAILABLE TO FLEE.

25         INDEED, PART OF THE CHARGES IN THIS CASE RELATE TO

1   THE DEFENDANT'S POSSESSION OF NUMEROUS FALSE IDENTIFICATION

2   DOCUMENTS, THE DEFENDANT HAS ACCESS TO THOSE THINGS.  SO AS

3   THE TRIAL DATE APPROACHES, OR AS THE EVIDENCE IS COMING

4   AGAINST HIM THE DEFENDANT WOULD HAVE AN OPPORTUNITY TO FLEE.

5   THE FACT THAT HE DIDN'T FLEE AT THE TIME OF THE CHARGE DOES

6   NOT MEAN HE WOULDN'T FLEE ONCE IT CAME CLOSER TO TRIAL.

7           THE COURT:  ALL RIGHT.  MR. ZIMET.

8           MR. ZIMET:  JUDGE, NUMBER ONE, ALL THE FACTORS

9   DESCRIBED BY THE PROSECUTOR ARE ELEMENTS WHICH OBVIOUSLY CAN

10  BE UTILIZED BY THE COURT AS ELEMENTS TO PREDICT FUTURE

11  CONDUCT, AND CERTAINLY ONE OF DILEMMAS WHICH ANY MAGISTRATE

12  JUDGE OR ANY JUDGE HAS CONCERNING BOND IS WHAT IS GOING TO

13  HAPPEN IN THE FUTURE.

14          IN THIS CASE BECAUSE OF THE INTERIM, BECAUSE OF

15  THE TIME PERIOD BETWEEN MR. MARIANI BECOMING AWARE OF THE

16  CHARGES AND MR. MARIANI'S ARREST, WE HAVE MORE THAN WE CAN

17  UTILIZE IN JUST OTHER EVENTS WHICH TOOK PLACE DURING THE

18  PART OF HIS PRIOR CRIMINAL ACTIVITY.

19          NUMBER ONE, WE HAVE THE FACT THAT MR. MARIANI HAD

20  A RESIDENCE WHICH HE MAINTAINED AND RESIDED AT.  WE HAVE THE

21  FACT THAT MR. MARIANI BECAME INVOLVED IN ASSISTING OTHER

22  PEOPLE WHILE HE WAS PRESENT DURING -- IN THIS DISTRICT

23  AWAITING THE FACT OF BEING ARRESTED.

24          HE GOT INVOLVED WITH -- HE IS INVOLVED WITH A

25  WOMAN, INVOLVED IN THE LIVES OF HER CHILDREN, GOING TO

1  PARENT/TEACHER CONFERENCES.  HE IS INVOLVED WITH AN

2  INDIVIDUAL WHO NEEDED SIGNIFICANT MEDICAL ATTENTION KNOWING

3  THAT HE HAD A RISK THAT IN THE MIDDLE OF ALL THAT, THAT HE

4  COULD BE ARRESTED AND TAKEN AWAY FROM THAT PERSON.

5        IF HE WANTED TO FLEE HE HAD A PASSPORT, HE HAD

6  AMPLE OPPORTUNITY, AT LEAST A YEAR TO A YEAR AND A HALF

7  AHEAD OF TIME.  IF HE HAD WANTED TO FLEE THEN HE COULD HAVE

8  FLED.  HE WAS WAITING EVERY FRIDAY TO GET ARRESTED.

9        MR. PERKINS' TESTIMONY IS -- WAS NOT CHALLENGED BY

10 THE GOVERNMENT THAT MR. MARIANI WAS SITTING IN HIS HOUSE

11 EVERY FRIDAY WITH BAGS PACKED AWAITING FOR LAW ENFORCEMENT

12 TO PICK HIM UP, WHICH OBVIOUSLY WE ALL KNOW FROM BEING

13 INVOLVED IN THIS SYSTEM IS THE TRADITIONAL TIME THAT MANY

14 ARRESTS TAKE PLACE WITH PEOPLE WHO ARE INDICTED.

15        I WILL POINT OUT THE FACT THAT FROM THE STANDPOINT

16 OF THIS CASE ITSELF THAT MR. MARIANI, FROM THE GOVERNMENT'S

17 OWN DESCRIPTION, IS A PERSON WHO WAS TAKING ORDERS FROM

18 OTHER PEOPLE.  MR. MARIANI AS A COLLECTOR OR ENFORCER,

19 WHATEVER TERM YOU WANT TO CALL IT, OBVIOUSLY WAS BEING

20 DIRECTED BY -- ACCORDING TO THE GOVERNMENT'S THEORY AT LEAST

21 BEING DIRECTED BY OTHER INDIVIDUALS.  AND CERTAINLY THE

22 GOVERNMENT -- AND I WOULD PROFFER IT IS RELEVANT FROM THE

23 STANDPOINT THE GOVERNMENT'S POSITION OF FLIGHT RISK AND

24 DANGER TO THE COMMUNITY THAT THE PERSON MAKING THOSE ORDERS

25 HAS NOT IN ANY WAY BEEN RESTRICTED AND DETAINED IN CUSTODY.

1  I BELIEVE THAT PERSON IS UNDER HOUSE ARREST PENDING TRIAL.

2           MR. MARIANI'S VIOLENT ACTIVITY TOOK PLACE IN A

3  SITUATION OF A CAR ACCIDENT, IT WAS NOT PART OF A CRIME

4  SPREE, WHICH I THINK WAS DESCRIBED BY THE PROSECUTOR.  IT

5  WAS AN INCIDENT WHERE THERE WAS A FIGHT BETWEEN TWO

6  MOTORISTS AND MR. MARIANI PUNCHED SOMEBODY, WHICH CERTAINLY

7  IS NOT TO SAY IT WAS JUSTIFIED BEHAVIOR BUT CERTAINLY IS NOT

8  PART OF SOMEONE GOING OUT INTENTIONALLY TRYING TO GO OUT AND

9  TO HURT PEOPLE.

10          THE ARSON CASE I THINK WE DESCRIBED SPECIFICALLY

11 FROM THE STANDPOINT OF THE JUDGE'S FINDING.  HE WAS NOT

12 ELEVATED.  HE IS NOT THE PERSON WHO ACTUALLY SET THE FIRE,

13 ALTHOUGH HE WAS CONVICTED OF THAT CRIME.

14          UNDER THE CIRCUMSTANCES, JUDGE, WE WOULD SUBMIT

15 THAT WITH HIS PARENTS WHO ARE PRESENT IN COURT, HIS FATHER

16 IS PRESENT, WHO ARE WILLING TO PUT UP HIS PROPERTY IN NEW

17 YORK THAT THERE IS AMPLE INFORMATION AND AMPLE SECURITY FOR

18 THE COURT TO BELIEVE THAT MARIANI -- MR. MARIANI WITH

19 RESTRICTIONS SUCH AS HOUSE ARREST, WILL SHOW UP FOR HIS

20 COURT DATE.

21          IT IS SOMETHING HE HAS KNOWN ABOUT FOR A LONG

22 TIME, SOMETHING HE KNEW WAS GOING TO HAPPEN, AND SOMETHING

23 THAT HE WAS AWARE WAS GOING TO HAPPEN AND WAS PREPARED FOR

24 IT AND IS NOW WILLING TO FACE THE CONSEQUENCES.

25          THE COURT:  ALL RIGHT.  THE COURT HAS LISTENED

54

1  VERY, VERY CAREFULLY TO THE PRESENTATIONS MADE BY THE

2  GOVERNMENT, THE DEFENSE'S ARGUMENT, THE TESTIMONY GIVEN, THE

3  PRETRIAL SERVICES REPORT, AND THE COURT HAS REVIEWED THE

4  UNDERLYING DOCUMENTS AND THE INDICTMENT ITSELF.

5          AFTER HAVING BEEN ON THE BENCH FOR NINE YEARS I

6  HAVE COME TO ONE CONCLUSION, NOT EVERYONE IS ALL GOOD OR ALL

7  BAD.  EVERYONE HAS CERTAIN FACETS OF EACH IN THEIR LIFE.

8          THE COURT DOESN'T FIND THAT THIS DEFENDANT

9  REPRESENTS A RISK OF FLIGHT.  HOWEVER, THE COURT IS

10 CONCERNED AND DOES FIND THAT HE REPRESENTS A THREAT OF

11 DANGER IN THE COMMUNITY, AND THAT FINDING IS BASED UPON AN

12 EXAMINATION OF MR. MARIANI'S RECORD.  IN 1989 HE WAS

13 CONVICTED, AMONG OTHER THINGS, OF RESISTING AN OFFICER

14 WITHOUT VIOLENCE AND SERVED TWO MONTHS IN JAIL.

15         IN 1990 WE HAVE HEARD MUCH ABOUT THE ARSON

16 CONVICTION, AND HE WAS SENTENCED TO 46 MONTHS CONFINEMENT.

17 THEREAFTER IN 1995 HE WAS CHARGED WITH AND CONVICTED OF

18 AGGRAVATED BATTERY, HIT AND RUN AND SERVED TWO YEARS AND

19 FOUR MONTHS IN CONFINEMENT.

20         SUBSEQUENTLY HE WAS CHARGED WITH A SUPERVISED

21 RELEASE VIOLATION, AMONG WHICH INVOLVED CLAIMING THAT HE

22 POSED AS AN FBI AGENT.

23         ALL OF THESE FACTORS LEAD ME TO CONCLUDE, AND I DO

24 CONCLUDE, THAT HE REPRESENTS A RISK OF DANGER IN THE

25 COMMUNITY.  ACCORDINGLY, I FIND THERE IS NO CONDITION OR

95

```
1    COMBINATION OF CONDITIONS I COULD SET THAT WOULD ASSURE ME

2    THAT HE NO LONGER REPRESENTS SUCH A RISK.

3         THE GOVERNMENT'S MOTION FOR PRETRIAL DETENTION IS

4    GRANTED ON RISK OF DANGER, NOT RISK OF FLIGHT.

5         MR. DITTOE, IF YOU WOULD HAVE AN ORDER PREPARED IN

6    MY CHAMBERS BY FIVE TOMORROW.

7         MR. DITTOE:  YES, SIR.

8         MR. ZIMET:  THANK YOU, JUDGE.

9                        -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                            C E R T I F I C A T E

4

5

6    UNITED STATES OF AMERICA

7    SOUTHERN DISTRICT OF FLORIDA

8

9

10        I, **CARL SCHANZLEH**, OFFICIAL COURT REPORTER OF THE

11   UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF

12   FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 55 PAGES

13   CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE

14   THE SAID COURT HELD IN THE CITY OF MIAMI, FLORIDA, IN THE

15   MATTER THEREIN STATED.

16        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

17   21ST DAY OF JULY, 2000.

18

19                              _____

                                **CARL SCHANZLEH, RPR-CM**
20                              OFFICIAL FEDERAL COURT REPORTER
                                299 EAST BROWARD BLVD., 202B
21                              FORT LAUDERDALE, FL  33301

22

23

24

25