UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6088-CR-UNGARO-BENAGES

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )
                                )
v.                              )
                                )
                                )
NICOLO MARIANI,                 )
                                )
              Defendant.        )
_____)

NIGHT BOX
FILED

AUG 1 1 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**GOVERNMENT'S RESPONSE TO DEFENDANT MARIANI'S APPEAL FROM MAGISTRATE JUDGE GARBER'S PRE-TRIAL DETENTION ORDER**

Comes now the United States and files its Response to the Defendant Mariani's Appeal of his Pre-trial Detention Order.

I  <u>INTRODUCTION</u>

This matter is before the Court on the Defendant Mariani's appeal from Magistrate Judge Garber's Order granting the government's motion for pre-trial detention. The proffer and evidence adduced at the hearing on July 17, 2000, established that the defendant Mariani was a danger to the community. Accordingly, the defendant Mariani should be detained pending trial.

II <u>STANDARD OF REVIEW and APPLICABLE LEGAL PRINCIPLES</u>

It is, of course, well settled that the district court conducts a <u>de novo</u> review of the government's request for pre-trial detention. <u>United States v. King</u>, 849 F.2d 485, 490 (11th Cir. 1988). A <u>de novo</u> review, however, does not require the district



court to hold a <u>de novo</u> hearing. In conducting its review the district court may rely on the transcript of the hearing that occurred before the magistrate judge. <u>United States v. Gaviria</u>, 828 F.2d 667, 668 (11th Cir. 1987). Such a procedure serves the interests of judicial economy and the speedy determination of issues. <u>United States v. Messino</u>, 842 F. Supp. 1107, 1109 (N.D. Ill. 1994); <u>United States v. Bergner</u>, 800 F. Supp. 659, 661 (N.D. Ind. 1992); <u>United States v. Allen</u>, 605 F. Supp. 864, 867 (W.D. Pa. 1985). Accordingly, this Court should conduct its <u>de novo</u> review based on the evidence presented to Magistrate Judge Garber.

Furthermore, the return of the indictment provides the basis for concluding establishing probable cause that the defendant committed the charged offenses. See <u>United States v. Quartermaine</u>, 913 F.2d 910, 916 (11th Cir. 1990). In order for a court to order the pre-trial detention of a defendant, the government is required to establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's presence at trial. <u>United States v. Quartermaine</u>, 913 F.2d at 917. The government may also independently demonstrate the need for pre-trial detention by presenting clear and convincing evidence that the defendant is a danger to the community. <u>Id</u>. The Eleventh Circuit, in accord with the legislative history of the pre-trial detention statute, observed that the risk that a defendant will continue to engage in criminal activity constitutes a danger to the

2

'safety of any other person or the community. <u>United States v.</u> <u>King</u>, 849 F.2d 485, 487 n.2 (11th Cir. 1988).

In <u>United States v. Gaviria</u>, 828 F.2d 667, 668-69 (11th Cir. 1987), the Eleventh Circuit held that the United States is not required to present any witnesses at a detention hearing. The United State may present evidence solely based on the unsworn proffer from the prosecutor.  The court further ruled that the magistrate judge may prohibit the defendant from calling the case agent as an adverse witness even though the agent is present at the hearing. <u>Id</u> at 670.

In the case at bar, the defendant was afforded far greater latitude at the detention hearing than was the defendant in <u>Gaviria</u>. In this case, the United States produced an agent for cross-examination. As observed by the court in <u>Gaviria</u>, pre-trial detention hearings are not a vehicle to afford a defendant with pre-trial discovery. 828 F.2d at 669.  The court should conduct its <u>de novo</u> review based on the transcript produced at the hearing before the magistrate judge. <u>Gaviria</u>, 828 F.2d at 670. Accord <u>United States v. Messino</u>, 842 F. Supp. at 1109; <u>United States v.</u> <u>Bergner</u>, 800 F. Supp. at 661; <u>United States v. Allen</u>, 605 F. Supp. at 867.

3

### III THE HEARING BEFORE THE MAGISTRATE

#### A. PROCEDURE

At the hearing, the United States proceeded by way of proffer. Under that procedure, the prosecutor summarized the evidence and tendered Special Agent Tammy Kayworth, a case agent, for cross examination (Tr. at 6-12, 12-23).[1] Agent Kayworth testified based on her personal participation in the investigation, her review of intercepted communications, and her discussions with other agents assigned to the investigation (Tr. 12-13).[2]

#### B. FACTS ADDUCED AT THE HEARING

#### 1. Charges against Mariani

---

[1] The transcript of the July 17, 2000 detention hearing is not attached to this response because a copy was attached to the defendant's motion and the original was filed in the Court's file. Whenever a citation is made using "Tr." it is to the July 17, 2000 detention hearing.

[2] The defendant was not even entitled to the evidentiary hearing held before Magistrate Garber, because he had previously agreed and stipulated to in a hearing before Magistrate Judge Johnson on May 31, 2000 at which the defendant was represented by different counsel (Attachment 1 at p 11-12). Judge Johnson made clear that in order to be entitled to an evidentiary hearing the defendant was required to show changed circumstances. Judge Johnson held that "he [Mariani] has on this record at this time, based on these charges and this Defendant's prior record, stipulated to pre-trial detention without further need of hearing. If something changes, and his client gets pardoned or the government's case falls apart, somebody will move for something different" (Attachment 1 at p. 12) Judge Johnson, who was clearly aware of the defendant's extensive prior record, ruled that a change of circumstance was needed before the defendant could obtain a new hearing on the issue of detention. The defendant, however, requested and was granted an evidentiary hearing on the issue of detention without demonstrating any changed circumstances.

The defendant is charged with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d) (Count 1), conspiring to affect interstate commerce by extortion in violation of 18 U.S.C. § 1951 (Count 3), affecting interstate commerce by extortion in violation of 18 U.S.C. § 1951 (Count 4), conspiring to use extortionate means to collect credit, in violation of 18 U.S.C. § 894 (Count 5), using extortionate means to collect credit, in violation of 18 U.S.C. § 894 (Count 6), and conducting an illegal gambling business in violation of 18 U.S.C. § 1955 (Count 7). Based on the Indictment of the Grand Jury, it is evident that the defendant is charged with a crime of violence that has as an element thereof, the use, attempted use, or threatened use of force against the person or property of another as required by 18 U.S.C. § 3142(f)(1)(A). See 18 U.S.C. § 3156(a)(1)(4).

Specifically, the defendant acted as an enforcer for Marco Minuto, the leader of the Racketeering Enterprise and a soldier in the Luchese Organized Crime Family. Mariani is charged with collecting gambling debts by physically harming persons and threatening such persons with physical harm. (Indictment, Manner and Means ¶ 8). In addition, to the acts of violence, Mariani attempted to obstruct justice by directing witnesses to testify falsely before a federal grand jury that was investigating the criminal activities of the enterprise. (Indictment, Manner and

5

Means ¶ 24). The defendant further participated in the affairs of the enterprise by selling property stolen from interstate shipments (Indictment, Manner and Means ¶ 19); using and obtaining counterfeit checks to fraudulently obtain money and property (Indictment, Manner and Means ¶ 19); and using and obtaining fraudulent identification documents as a means to fraudulently obtain money and property;(Indictment, Manner and Means ¶ 21). The evidence establishing these crimes consists of testimony from eyewitnesses and consensually recorded conversations with the defendant and a court authorized wire interception (Tr.6).

### 2. Defendant's Criminal History

Unlike the other defendant's charged in this case, Mariani has an extensive prior criminal record including numerous violations of supervised release.[3] Furthermore, the defendant has a history of using alias's and flight. Consequently, the government concludes that the defendant is both a danger to the community and a flight risk.[4]

---

[3] It is because of this extensive criminal record, including a flight to avoid arrest for a violation of supervised release, that the United States concludes that detention for this defendant is warranted. Defendant implies that his detention until the date of trial in February 2000 is unfair. However, at the time trial was set defendant knew full well that a detention order had been issue by Judge Johnson and that it was the government's position that detention was warranted.

[4] The Magistrate Judge found that the defendant was a danger to the community, but not a flight risk. The United States maintains that he is both and submits that this Court should so find in this de novo review of the record.

The defendant was convicted of arson in federal court in 1988 and burned his own store for the insurance money. A fireman and other persons suffered injuries as a result of the arson[5] (Tr.6-7). After serving a period of incarceration, Mariani was placed on supervised release. While on supervised release, Mariani committed a variety of violent crimes and avoided arrest for violation of his supervised release. Mariani committed an aggravated battery against an automobile driver with whom he had a dispute. The victim's jaw was broken in two places and surgery was required. The victim's jaw was wired shut for seven weeks and he was not able to eat solid food for twelve weeks (Tr. 8).

While on supervised release, Mariani attempted to gain illegal entry to the home of a victim by posing as an FBI agent. This criminal scheme started when Mariani confronted the victim while he was driving to his house while being stalked by Mariani. The defendant undertook this criminal act in an effort to intimidate the victim and made threats of force to gain entry to the victim's residence. This act caused psychological trauma to the adult victim's child who witnessed the Defendant's criminal acts. The

---

[5] At the detention hearing, the government relied on a Pre-sentence investigation report that recommended that the defendant receive an increased sentence because of the injury suffered to persons as a result of the arson. (Tr at 24). Apparently, the sentencing court did not follow this recommendation. The government was not aware of the sentencing court's apparent conclusion when it presented the pre-sentence investigation report to the Magistrate Judge (Tr. 26).

child required counseling from a mental health professional as a result of the defendant's deliberate conduct (Tr. 8). When the defendant was arrested in connection with these acts, he was found to be in possession of multiple false identification documents and credit card access devices. The false identifications all bore a photograph of the defendant but had different names (Tr. 9).

Moreover, the defendant has a demonstrated history of flight. Although he later returned, the defendant fled the scene of the crime where he had broken the jaw of the automobile driver. He failed to report his arrests to his probation officer, and then changed his residence after he was charged with violations of supervised release (Tr.9). On cross examination, the defendant admitted that he changed his place of residence after he broke the jaw of the motorist(Tr. 42-43). The defendant further admitted that he lived at the new address for several months before he was located and arrested by the U.S. Marshals to answer for the supervised release violations (Tr. 43).

An extensive hearing was held before Magistrate Judge Vitunac on the supervised release charges. The Magistrate Judge, in an opinion adopted by United States District Judge Paine, found that the defendant had committed numerous violations of his supervised release.[6]

The defendant's intent to continue committing violent acts is

---

[6] These opinions are appended as attachments 2 and 3.

demonstrated by a court authorized telephone interception.[7]    In this conversation, Mariani who was in prison for his supervised release violation, was speaking to Marcello Grasso.  Grasso is a defendant in this case:

Grasso: "I, I, I hope that you ch-that everything changes and you get a little different attitude..."

Mariani: "Ah, we'll see."

Grasso: "You know? I really do."

Mariani: "We'll see.  There's still a few uhh..."

Grasso: "I know, I know you..."

Mariani: "There's still a few people that need some whacks."

Grasso: "I know, it's see...y-y-tou can't change the uh, a leopard's spots but..."

Mariani: " Yeah, uh."

Transcript of October 13, 1998 Conversation at page 17 (Attachment 4 at page 17).

        IV  THE DEFENDANT MARIANI SHOULD BE DETAINED

The evidence adduced at the detention hearing demonstrated that the defendant is both a danger to the community and a flight risk.  In considering each of the statutory factors and the evidence presented at the hearing the United States has met its

---

[7] The full transcript is set forth in attachment 4.  The tape is available for the court's review.  The transcript and tape were also available at the detention hearing, but no request was made by the defense of the government to play the tape.

burden and the defendant should be detained. 18 U.S.C. 3142(g)

The defendant also makes much of the fact that he has ties to the community. This fact, however, as noted by the legislative history of the pre-trial detention statute, is the least significant factor to be considered when making a determination concerning pre-trial detention.

> The Committee...notes, with respect to the factor of community ties, that it is <u>aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance and has no correlation with the question of the safety of the community.</u> While the Committee considered deleting this factor altogether, it has decided to retain it at this time. However, the Committee wishes to make it clear that it does not intend that a court conclude there is no risk of flight on the basis of community ties alone; instead, a court is expected to weigh all the factors in the case before making its decision as to the risk of flight and danger to the community.

S. Rep. No. 98-2255, at p. 24-25 (emphasis supplied).

The evidence abduced at the detention hearing concerning the seriousness of the RICO charges facing the defendant, the substantial weight of the evidence against the defendant, and the defendant's demonstrated history of violence more than outweigh the defendant's ties to the community. The defendant Mariani is precisely the type of violent defendant for which pre-trial detention is required in order to reasonably protect the safety of the community and assure his appearance at trial.

V <u>CONCLUSION</u>

The defendant Mariani should be held without bond because he is both a danger to the community and a flight risk.

Respectfully submitted,

GUY A, LEWIS
UNITED STATES ATTORNEY

BY: _Michael J. Dittoe_
MICHAEL J. DITTOE
ASSISTANT UNITED STATES ATTORNEY
500 E. Broward Boulevard
Suite 700
Ft. Lauderdale, FL 33394-3002
Tel: (954) 356-7255
Fax: (954) 356-7230

11

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this 11th day of August 2000 to: Bruze A. Zimet, Esq. One Financial Plaza Suite 2612, Ft, Lauderdale, Fl. 33394,

Michael J. Dittoe
Assistant United States Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

UNITED STATES OF AMERICA,   . CASE NO. 00-6088-CR-UUB
.
           PLAINTIFF,   . MIAMI, FLORIDA
. MAY 31, 2000
         V.   . 10:00 A.M.
.
NICOLO MARIANI.   .
.
          DEFENDANT.   .
. . . . . . . . . . . . . . .

TRANSCRIPT OF ARRAIGNMENT AND BOND HEARING HAD
BEFORE THE HONORABLE LINNEA R. JOHNSON,
UNITED STATES MAGISTRATE JUDGE.

- - - - -
PAGES 1 THROUGH 17
- - - - -

APPEARANCES:

FOR THE GOVERNMENT:  MICHAEL J. DITTOE
                    ASSISTANT U.S. ATTORNEY
                    500 E. BROWARD BOULEVARD, 7TH FLOOR
                    FT. LAUDERDALE, 33394-3002

FOR THE DEFENDANT:  CHRISTOPHER A. GRILLO, ESQ.
                    1 EAST BROWARD BOULEVARD, SUITE 700
                    FT. LAUDERDALE, FLORIDA  33301-1843

TRANSCRIPTIONIST:  FRANCINE C. SALOPEK, R.M.R.
                    OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    301 NORTH MIAMI AVENUE, ROOM 804
                    MIAMI, FLORIDA  33128-7709
                    (305)523-5568

GOVERNMENT EXHIBIT
___1___

- - - - -

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING, TRANSCRIPT PRODUCED BY COMPUTER.

```
1              WEDNESDAY, MAY 31, 2000, 10:00 A.M.

2         THE COURT:  NICOLO MARIANI.

3         (DISCUSSION HAD OFF THE RECORD.)

4         THE COURT:  OKAY.  WHERE ARE WE GOING ON THIS?

5  REPORT RE:  COUNSEL.

6            MR. GRILLO:  GOOD MORNING, YOUR HONOR --

7            THE COURT:  MR. --

8            MR. GRILLO:  -- CHRIS GRILLO ON BEHALF OF THE

9  DEFENDANT.  I AM NOT PERMANENT COUNSEL, I AM TEMPORARY

10 COUNSEL.  AND MY CLIENT DOES NOT WANT TO PROCEED TODAY.  WE

11 DON'T WANT A BOND HEARING.

12           THE COURT:  HE DOES NOT WANT A BOND HEARING AT

13 ALL?

14           MR. GRILLO:  NOT TODAY.

15           THE COURT:  HE'S HERE?

16           MR. GRILLO:  HE'S RIGHT THERE.

17           THE COURT:  YOU SPEAK ENGLISH?

18           MR. GRILLO:  YES, HE DOES.

19           THE DEFENDANT:  I DO.

20           THE COURT:  OKAY.  MY CONCERN IS THAT HE'S BEEN IN

21 CUSTODY WITHOUT A PRETRIAL DETENTION HEARING FOR A FAIRLY

22 LONG PERIOD OF TIME.  I'M GONNA CONTINUE HIM IN PRETRIAL

23 DETENTION WITHOUT A FURTHER HEARING AT THE REQUEST OF THE

24 DEFENSE.

25           MR. GRILLO:  FINE.
```

3

```
 1              THE COURT:  AT ANY TIME YOU DESIRE A HEARING, YOU

 2  CAN SET IT ON THE CALENDAR.

 3              ARE YOU IN PERMANENTLY?

 4              MR. GRILLO:  NO, MA'AM.

 5              THE COURT:  HOW LONG IS IT GOING TO TAKE YOU TO

 6  GET IN PERMANENTLY?

 7              MR. GRILLO:  MAY I JUST HAVE A MOMENT?

 8              THE COURT:  YES.

 9              MR. GRILLO:  WELL, I GUESS THE QUESTION IS WILL HE

10  GO DOWN TO MIAMI NOW, BECAUSE, WELL, THE CASE IS IN MIAMI,

11  ET CETERA, AND I'LL JUST NEED TO KNOW WHEN TO SPEAK TO HIM

12  AND WHERE TO SPEAK WITH HIM.

13              I WOULD KNOW WITHIN A WEEK, JUDGE.

14              THE COURT:  I DON'T KNOW WHERE THE MARSHALS ARE

15  GONNA PUT HIM.

16              MR. GRILLO:  HE'S THE ONLY DEFENDANT IN THE CASE

17  THAT'S IN CUSTODY.  I WOULD THINK THEY'D TAKE HIM TO MIAMI.

18              (DISCUSSION HAD OFF THE RECORD.)

19              THE COURT:  WELL, THIS CASE IS SET FOR TRIAL

20  JUNE 19TH.  THIS CASE HAS BEEN DELAYED A NUMBER OF TIMES

21  BECAUSE APPARENTLY YOU'VE BEEN IN SOME OTHER COURTROOMS.

22              MR. GRILLO:  YES, MA'AM.

23              THE COURT:  AND I CAN TELL YOU THAT MY OFFICE HAD

24  A RATHER UNPLEASANT DEALING WITH SOMEBODY IN YOUR OFFICE IN

25  TRYING TO RESCHEDULE THE PRETRIAL DETENTION HEARING IN THIS
```

4

```
 1   CASE BETWEEN I WAS TRYING TO DO IT AND THEN JUDGE VITUNAC
 2   WAS TRYING TO DO IT, AND WE TRIED TO GET ONE OF THE
 3   MAGISTRATES IN MIAMI TO DO IT AT TWO O'CLOCK IN THE
 4   AFTERNOON FOR YOU BECAUSE APPARENTLY YOU WERE SUPPOSED TO BE
 5   IN FRONT OF JUDGE RYS -- JUDGE -- SOMEBODY.
 6            MR. GRILLO:  HIGHSMITH, JUDGE HIGHSMITH.
 7            THE COURT:  HIGHSMITH?
 8            MR. GRILLO:  JUDGE HIGHSMITH, YES, MA'AM.
 9            THE COURT:  SOMEWHERE DOWN THERE.
10            MR. GRILLO:  RIGHT.
11            THE COURT:  AND WE WERE TRYING TO ACCOMMODATE
12   THAT --
13            MR. GRILLO:  YES, MA'AM.
14            THE COURT:  -- FOR YOU.  AND THE MAGISTRATE DOWN
15   THERE THAT WAS ON DUTY AND COULD HAVE HELPED OUT HAD OTHER
16   PROBLEMS OR SOMETHING AND COULD NOT.  AND, BASICALLY,
17   SOMEBODY IN YOUR OFFICE JUST HUNG UP ON JUDGE VITUNAC'S
18   PEOPLE.  AND --
19            MR. GRILLO:  WELL, I APOLOGIZE FOR THAT, JUDGE.  I
20   MEAN I CAN ONLY THINK OF ONE PERSON THAT IT COULD BE.  AND
21   IF IT'S MY SECRETARY, SHE'S BEEN MY SECRETARY FOR 14 YEARS.
22   SHE'S USUALLY VERY RESPONSIBLE.  I DON'T KNOW WHAT HAPPENED
23   THAT DAY.  WE HAD SOME PERSONAL PRESSURES IN THE OFFICE
24   DURING THAT TIME THAT SHOULD NOT IMPACT ON THIS CASE IN
25   ANY WAY.  I DON'T KNOW WHAT HAPPENED.
```

```
1              THE COURT:  OKAY.

2              MR. GRILLO:  I KNOW I DID CALL JUDGE VITUNAC'S

3    CHAMBERS AND I CALLED MR. DITTOE'S CHAMBERS WHEN WE WERE

4    SCRAMBLING AROUND, BECAUSE IF YOU -- JUST TO BE CLEAR, WE

5    WERE SCHEDULED FOR A DETENTION HEARING IN FRONT OF JUDGE

6    TURNOFF.

7              THE COURT:  RIGHT.

8              MR. GRILLO:  ON THE WAY DOWN THERE, I HAD ASKED MY

9    SECRETARY TO CALL JUDGE TURNOFF TO LET HIM KNOW I WAS

10   RUNNING A FEW MINUTES LATE AND I'LL BE THERE SHORTLY.  AND

11   MY CLIENT'S PARENTS WERE HERE FROM NEW YORK AND ALL OF OUR

12   WITNESSES WERE EITHER THERE OR ON THE WAY.  SHORTLY AFTER WE

13   MADE THAT PHONE CALL, WE RECEIVED A CALL FROM SOMEBODY ON

14   NICK'S BEHALF SAYING THAT NICK WAS STILL IN WEST PALM BEACH.

15             THE COURT:  RIGHT.

16             MR. GRILLO:  SO THEN WE CALLED BACK TO JUDGE

17   TURNOFF'S CHAMBERS --

18             THE COURT:  RIGHT.

19             MR. GRILLO:  -- SAYING, WELL, THE CLIENT IS STILL

20   IN WEST PALM BEACH, WHAT TO DO?  AND APPARENTLY IT GOT

21   UNRAVELED.  AND IF SOMEBODY IN MY OFFICE WAS IMPOLITE TO

22   SOMEBODY, I APOLOGIZE.  THAT'S MY RESPONSIBILITY.  I'LL DEAL

23   WITH THAT.

24             THE COURT:  WELL, YOU NEED TO TALK TO THEM,

25   BECAUSE IT'S NOT A GOOD IDEA FOR THEM TO DO THAT --
```

6

```
 1            MR. GRILLO:  NEVER GET A JUDGE UPSET.

 2            THE COURT:  -- TO DO THAT.

 3            MR. GRILLO:  THAT'S NOT OUR RULE.

 4            THE COURT:  IT'S JUST NOT VERY PROFESSIONAL.

 5            MR. GRILLO:  YES, MA'AM.

 6            THE COURT:  ALSO, I UNDERSTAND SOMEONE IN YOUR

 7  OFFICE BASICALLY RELATED THAT, WELL, IF THEY COULDN'T HAVE

 8  IT -- A HEARING IN AT PARTICULAR LOCALE AT A PARTICULAR

 9  TIME, THAT, YOU KNOW, YOU WERE JUST GOING TO WITHDRAW.  AND,

10  SO I JUST -- IT DIDN'T -- IT DOESN'T BOTHER ME BECAUSE I

11  WASN'T INVOLVED.  AND I'M JUST RELATING TO YOU THAT IT

12  CAUSED A PRETTY BIG FLAK BETWEEN CERTAIN CHAMBERS AS TO THAT

13  THING.

14            MR. GRILLO:  JUDGE, I HAVE BEEN APPEARING BEFORE

15  YOU AND THE OTHER JUDGES IN THIS DISTRICT FOR A LONG TIME.

16            THE COURT:  OKAY.  YEAH, I UNDERSTAND.

17            MR. GRILLO:  AND I'VE ALWAYS TRIED TO MAINTAIN

18  GOOD RELATIONS WITH ALL OF YOU.  WE ALL NEED TO WORK

19  TOGETHER.  AND THERE'S ALWAYS BEEN --

20            THE COURT:  NO, NO, I UNDERSTAND.  I'M JUST

21  LETTING YOU KNOW --

22            MR. GRILLO:  OKAY.  I'LL TAKE CARE OF THE PROBLEM.

23            THE COURT:  -- THAT THERE WAS A BIG PROBLEM.

24            MR. GRILLO:  IF IT'S AN IN-HOUSE PROBLEM, IT'S MY

25  RESPONSIBILITY.  I WILL ADDRESS IT.
```

```
 1              THE COURT:  OKAY.  AND THOSE THINGS HAPPEN.  I
 2   MEAN IT'S NOT THE END OF THE WORLD.  THESE THINGS ARE
 3   QUICKLY FORGOTTEN, AS YOU KNOW.
 4              MR. GRILLO:  OKAY.  I APPRECIATE THE HEAD'S UP,
 5   JUDGE.
 6              THE COURT:  YEAH, THAT'S ALL I'M GIVING YOU
 7   BECAUSE I DON'T KNOW.  I MEAN SOMETIMES, YOU KNOW, STAFF AND
 8   THE OFFICE HAS A PROBLEM OR WHATEVER.  AND I DON'T -- I
 9   DON'T KNOW.
10              NOW, THE PROBLEM IS THIS CASE IS SET FOR TRIAL.
11   THIS DEFENDANT'S BEEN IN CUSTODY NOW A MONTH.
12              MR. GRILLO:  YES.
13              THE COURT:  IT'S SET FOR TRIAL IN 20 DAYS IN FRONT
14   OF JUDGE UNGARO.
15              MR. GRILLO:  AND WE HAVE A DISCOVERY REVIEW THIS
16   AFTERNOON THAT I'M ATTENDING, EVEN THOUGH I'M NOT PERMANENT
17   COUNSEL.  IF YOU WANT TO GIVE ME LESS TIME THAN THAT, SET IT
18   DOWN FOR MONDAY, I GUESS, OR WHENEVER YOU THINK IS
19   APPROPRIATE.
20              THE COURT:  WELL, HOW LONG -- I MEAN YOU NEED
21   TO -- YOU NEED TO EXPLAIN TO YOUR CLIENTS THAT THEY EITHER
22   HAVE TO MEET THEIR FINANCIAL OBLIGATIONS WITH YOU NOW OR
23   YOU'RE GONNA BE -- YOU KNOW, IF YOU ENTER AN APPEARANCE IN A
24   FEDERAL CASE WITHOUT BEING PAID, YOU'RE IN.
25              MR. GRILLO:  I KNOW THAT.
```

8

1          THE COURT:  AND YOU DON'T WANT TO BE IN THAT

2   POSTURE, I KNOW.

3          MR. GRILLO:  THIS IS SCHEDULE -- THIS IS, I THINK,

4   A SCHEDULE FOUR CASE?

5          THE COURT:  IT'S A BIG CASE.

6          MR. GRILLO:  A BIG CASE.  THEY ANTICIPATE FOUR TO

7   SIX WEEKS OF TRIAL, A BIG CASE.

8          THE COURT:  WELL --

9          MR. GRILLO:  A LOT OF TIME AND EFFORT WILL GO INTO

10  THIS.  I DOUBT IT WILL GO TO TRIAL IN JUNE, BUT I

11  UNDERSTAND --

12         THE COURT:  I MEAN I CAN'T SPEAK TO THAT, THAT'S

13  JUDGE UNGARO.  AND I HAVE TO HAVE THIS CASE, YOU KNOW, I

14  HAVE TO HAVE AN ATTORNEY IN OF RECORD.

15         MR. GRILLO:  YES, MA'AM.

16         THE COURT:  SO HOW LONG DO YOU NEED TO REPORT

17  REGARDING BEING PAID?

18         MR. GRILLO:  WELL --

19         THE COURT:  AND WHY HASN'T IT TAKEN PLACE BY NOW?

20         MR. GRILLO:  I CAN'T ANSWER THE SECOND QUESTION.

21  THAT WOULD INVOKE, OBVIOUSLY, COMMUNICATIONS I'VE HAD WITH

22  MY CLIENT.

23         THE COURT:  NO, I UNDERSTAND THAT.  BUT I MEAN ARE

24  YOU HOPEFUL THAT IT'S GOING TO WORK OUT OR NOT?

25         MR. GRILLO:  YES.

9

```
 1          THE COURT:  I ASSUME YOUR CLIENT PERSONALLY

 2  DOESN'T HAVE THE MONEY, IT'S SOMEBODY IN HIS FAMILY?

 3          MR. GRILLO:  WELL, PEOPLE ARE WORKING ON HIS

 4  BEHALF TO ARRANGE THE FUNDING, YES, MA'AM.

 5          THE COURT:  SOMEONE.

 6          MR. GRILLO:  MY CLIENT'S IN CUSTODY AND, AS YOU

 7  CAN TELL, THE GOVERNMENT IS SEEKING PRETRIAL DETENTION.

 8          THE COURT:  RIGHT, OF COURSE.

 9          MR. GRILLO:  AT THIS TIME WE ARE WAIVING THAT.

10  THE REPORT FOR PRETRIAL RECOMMENDS NO BAIL.

11          THE COURT:  YEAH.

12          MR. GRILLO:  SO WE UNDERSTAND THAT'S A LIKELY --

13  CERTAINLY A LIKELY POSSIBILITY.

14          THE COURT:  IS THE P.D.'S IN THIS CASE?

15          MR. GRILLO:  NO.

16          THE COURT:  EMILY?

17          MR. GRILLO:  I DON'T THINK SO.  WAIT A MINUTE,

18  WAIT A MINUTE.

19          MR. DITTOE:  NO, YOUR HONOR.

20          MR. GRILLO:  NO, I DON'T BELIEVE SO.  I THINK

21  EVERYBODY -- A COUPLE OF THE PEOPLE ARE FROM UP NORTH.  AND

22  I DON'T KNOW WHAT THEY'RE DOING, BUT I BELIEVE THEY HAVE

23  LAWYERS UP THERE WHERE THEY SURRENDERED OR RELEASED.  I

24  DON'T KNOW WHAT THEY ARE DOING ABOUT --

25          THE COURT:  OKAY.  YOU KNOW WHAT I'M GONNA DO?
```

10

1              MR. GRILLO:  -- LOCAL COUNSEL.

2              THE COURT:  MR. MARIANI, DO YOU, YOURSELF -- I'M

3    LOOKING AT YOUR PRETRIAL SERVICES REPORT AND WHAT YOU

4    RELATED.  YOU HAVE A LITTLE BIT OF STOCK AND A LITTLE BIT OF

5    MONEY IN A CHECKING ACCOUNT.  DO YOU OWN ANY PROPERTY, ANY

6    REAL ESTATE?

7              THE DEFENDANT:  NO, I DON'T, YOUR HONOR.

8              THE COURT:  DO YOU OWN ANY AIRPLANES?  CARS?

9              THE DEFENDANT:  NO.  I WISH I DID.

10             THE COURT:  ME, TOO.  AN AIRPLANE WOULD BE NICE

11   THIS TIME OF -- FLY OFF TO EUROPE OR SOMETHING.

12             YOU HAVE ANY OTHER LARGE AMOUNTS OF CASH ANYWHERE?

13             THE DEFENDANT:  NO, I DON'T, YOUR HONOR.

14             THE COURT:  ANY OTHER THINGS OF GREAT VALUE THAT

15   COULD BE SOLD AND TURNED INTO LIQUID CASH -- JEWELRY, THINGS

16   LIKE THAT?

17             THE DEFENDANT:  NO, YOUR HONOR, I DON'T.

18             MR. GRILLO:  YOUR HONOR, HE WAS RELEASED FROM JAIL

19   ABOUT A YEAR --

20             THE DEFENDANT:  SIXTEEN MONTHS.

21             MR. GRILLO:  -- AND A HALF AGO.

22             THE COURT:  ALL RIGHT.

23             MR. GRILLO:  SO --

24             THE COURT:  AND HE'S --

25             MR. GRILLO:  HE WAS IN JAIL FOR A COUPLE OF YEARS.

1  HE WAS OUT ON BOND.  HE WAS IN JAIL BEFORE THAT.  SO, HE HAS

2  NOT BEEN AT LIBERTY A LOT IN THE LAST FIVE, EIGHT YEARS, TEN

3  YEARS.

4          THE COURT:  I'M GONNA APPOINT A FEDERAL PUBLIC

5  DEFENDER AT THIS TIME TO REPRESENT THE DEFENDANT.  THAT WAY

6  I KNOW HE'S GOT -- THAT WAY -- GO GET ME A P.D.

7          MR. DITTOE:  YOUR HONOR, COULD THE GOVERNMENT BE

8  HEARD --

9          THE COURT:  WHAT?

10          MR. DITTOE:  -- ON SOME OF THESE ISSUES --

11          THE COURT:  WHAT?

12          MR. DITTOE:  -- PARTICULARLY THE REQUEST FOR A

13  CONTINUANCE?

14          THE COURT:  WHAT?  CONTINUANCE OF WHAT?

15          MR. DITTOE:  OF THE DETENTION HEARING.

16          THE COURT:  OKAY.

17          MR. DITTOE:  THE GOVERNMENT OBJECTS, FRANKLY, YOUR

18  HONOR, TO ANY FURTHER CONTINUANCE OF A DETENTION HEARING.

19  IF THE DEFENDANT WISHES TO STIPULATE TO PRETRIAL --

20          THE COURT:  THAT WHAT HE'S DONE.

21          MR. DITTOE:  -- WITHOUT -- THEN I WOULD HAVE NO

22  OBJECTION TO THAT.

23          THE COURT:  NOW, I'M ALWAYS GONNA ALLOW A

24  DEFENDANT, UPON A CHAIN OF CIRCUMSTANCES, TO REVISIT A

25  PRETRIAL DETENTION REQUEST, WHETHER IT'S A STIPULATED

1  MATTER -- ANY OTHER MAGISTRATE WOULD.  BUT HE HAS ON THIS

2  RECORD AT THIS TIME, BASED ON THESE CHARGES AND THIS

3  DEFENDANT'S PRIOR RECORD, STIPULATED TO PRETRIAL DETENTION

4  WITHOUT FURTHER NEED OF HEARING.  IF SOMETHING CHANGES AND

5  HIS CLIENT GETS PARDONED OR THE GOVERNMENT'S CASE FALLS

6  APART, SOMEBODY WILL MOVE FOR SOMETHING DIFFERENT.

7           MR. DITTOE:  BUT IT WOULD HAVE TO BE CHANGED

8  CIRCUMSTANCES, YOUR HONOR.

9           THE COURT:  YES.

10          MR. DITTOE:  SOMETHING'S THAT NOT NOW KNOWN TO THE

11 COURT.

12          THE COURT:  YES.

13          MR. DITTOE:  THANK YOU, YOUR HONOR.

14          THE COURT:  NOW, DO YOU KNOW OF ANY ASSETS THAT HE

15 MIGHT HAVE TO HIRE AN ATTORNEY, SINCE THIS IS YOUR CASE?

16          MR. DITTOE:  NO, YOUR HONOR.

17          THE COURT:  OKAY.  NOW, WHAT THIS IS GONNA DO IS

18 I'M APPOINTING THE PUBLIC DEFENDER, SO I GOT A LAWYER IN ON

19 THIS CASE THAT'S GONNA BE STAYING IN.  AND I'M GONNA ARRAIGN

20 THE DEFENDANT TODAY.  AND IF YOU WORK OUT THE FINANCIAL

21 ASPECT OF THE CASE WITH THE FAMILY, YOU JUST SUBSTITUTE IN.

22          MR. GRILLO:  OKAY.

23          THE COURT:  AND THAT WAY JUDGE UNGARO HAS A LAWYER

24 IN, THE CASE IS SET FOR TRIAL ON THE 19TH.  IF YOU COME IN

25 TWO WEEKS FROM NOW AND SHE KEEPS IT ON THE TRIAL DATE OF THE

13

1  19TH, THEN YOU WILL GO TO TRIAL ON THE 19TH.  IF SHE

2  CONTINUES IT, GREAT.  AND IT MEANS I DON'T HAVE TO HAVE

3  ANY MORE HEARINGS UP HERE, WHICH WILL MAKE IT EASIER FOR YOU

4  TO STAY IN MIAMI.

5          MR. GRILLO:  THANK YOU.

6          THE COURT:  OKAY.

7          MR. GRILLO:  DO YOU WANT ME TO ARRAIGN HIM?

8          THE COURT:  NO, I'M GONNA GET THE P.D. TO DO THAT

9  RIGHT NOW.

10          THEY ARE SENDING ONE OVER, RIGHT?  ARE THEY IN THE

11 BUILDING?

12          ROOM CLERK:  YEAH.  THEY'RE PAGING HIM.

13 (INAUDIBLE) THOUGHT HE MIGHT NOT BE NEEDED SO --

14          THE COURT:  OKAY.  WELL, YOU CAN JUST HAVE A SEAT,

15 IF YOU WANT, AND/OR YOU CAN GO.

16          MR. GRILLO:  NO, NO, I'M GONNA STICK AROUND,

17 JUDGE.

18          THE COURT:  AND --

19          MR. GRILLO:  AS I SAID, AS A FRIEND OF THE COURT,

20 I'D BE HAPPY TO STAND IN FOR THE ARRAIGNMENT IF THAT'S WHAT

21 THE COURT REQUIRES OR WOULD LIKE TO FACILITATE THIS.

22          THE COURT:  NO.  I'M GONNA HAVE THE PUBLIC

23 DEFENDER REVIEW THE INDICTMENT RIGHT NOW AND DISCUSS IT WITH

24 THEIR CLIENT AND ARRAIGN HIM RIGHT NOW.  OR THEY CAN RESET

25 THE ARRAIGNMENT IF, AFTER TALKING TO HIM ABOUT THE SPECIFIC

14

```
 1   CHARGES, THEY FEEL THAT THAT SHOULD BE DONE.  AND THE P.D.'S
 2   CAN ARRAIGN HIM ANYWHERE WITHOUT WORRYING ABOUT INTERRUPTING
 3   THEIR OFFICE, YOU KNOW.
 4           MR. GRILLO:  RIGHT.
 5           THE COURT:  SO, THAT'S WHAT WE'RE GONNA DO.  I'M
 6   JUST GONNA WAIT UNTIL THE P.D.'S COME IN HERE AND WE WILL DO
 7   THAT.
 8           MR. GRILLO:  YOU THINK SOMEONE'S IN THE BUILDING
 9   THEN?
10           THE COURT:  I KNOW THEY ARE.  RIGHT, EMILY?
11           ROOM CLERK:  HOPEFULLY.
12           MR. GRILLO:  EMILY SAYS YES.  I GUESS EMILY KNOWS.
13           THE COURT:  WHERE IS THEIR OFFICE?  IT'S DOWN THE
14   STREET, THOUGH.
15           ROOM CLERK:  YEAH, BUT HE WAS HERE JUST A LITTLE
16   WHILE AGO, SO ...
17           THE COURT:  I HAVE A CIVIL CASE AT 11, RIGHT?
18           ROOM CLERK:  11:30.
19           THE COURT:  HUH?
20           ROOM CLERK:  11:30.
21           THE COURT:  OKAY.  WELL, EVEN IF THEY ARE IN
22   ANOTHER BUILDING, THEY WILL BE HERE WITHIN 15 MINUTES.  SO
23   YOU CAN EITHER STAY OR LEAVE OR WHATEVER WORKS FOR YOU.
24           MR. GRILLO:  I PREFER TO STAY, AT LEAST FOR NOW
25   ANYWAYS.
```

```
 1              THE COURT:  SURE.

 2              MR. GRILLO:  SO I CAN TALK TO MY CLIENT, TALK TO

 3  THE P.D.

 4              THE COURT:  OKAY.  NO PROBLEM.  THEN THAT WILL

 5  SOLVE ALL THIS.  OKAY.  THANK YOU.

 6              THEY AMBUSHED HIM?  WHERE IS HE?

 7              UNIDENTIFIED SPEAKER:  IN THE LOBBY.

 8              THE COURT:  IN THE LOBBY.  SEE, THEY CAUGHT HIM,

 9  THEY WOULDN'T LET HIM OUT OF THE BUILDING.  I'M GONNA SIT

10  RIGHT HERE WHILE THEY SEND HIM UP.

11              UNIDENTIFIED SPEAKER:  HE'S ON HIS WAY UP.

12              THE COURT:  YOU ALMOST GOT AWAY.

13              UNIDENTIFIED SPEAKER:  THE MARSHALS TAGGED ME.

14              (PAUSE.)

15              THE COURT:  GREAT.  THANKS FOR COMING IN.

16              I'VE JUST APPOINTED THE PUBLIC DEFENDER ON NICOLO

17  MARIANI.  IT'S A R.I.C.O./MONEY LAUNDERING/FRAUD CASE OUT OF

18  MIAMI.

19              MR. GRILLO:  MAY I JUST HAVE A MOMENT TO BRING HIM

20  UP TO SPEED, SO TO SPEAK?

21              THE COURT:  YEAH.  ONE SECOND.

22              MR. GRILLO:  YES, MA'AM.

23              THE COURT:  MR. GRILLO HAS BEEN TRYING TO COME IN

24  AND MAKE AN APPEARANCE IN THE CASE.  HE'S FROM MIAMI.  AND

25  WE HAVE BEEN HAVING SOME PROBLEMS WITH THE NEED TO, ONCE WE
```

```
 1   GET OUR HANDS ON HIM FOR BOND HEARINGS, WE KEEP HIM UP HERE

 2   IN PALM BEACH.  I TRIED TO SEND HIM TO MIAMI, BUT THAT

 3   DIDN'T WORK OUT EITHER, FOR A VARIETY OF JUST KIND OF

 4   INSTITUTIONAL SCREW-UPS.  AND, IN ANY EVENT, COUNSEL MAY

 5   SUBSTITUTE IN LATER, HE MIGHT NOT.  I DON'T KNOW.  YOUR

 6   CLIENT DOESN'T HAVE MONEY TO HIRE AN ATTORNEY.

 7           HE HAS BEEN IN AND OUT OF JAIL FOR TEN YEARS AND

 8   IS SET FOR TRIAL JUNE 19TH IN MIAMI.  AND ONE WAY OR THE

 9   OTHER, THE P.D.'S CAN TRY THE CASE IF MR. GRILLO DOESN'T GET

10   RETAINED.

11           HE'S STIPULATED TO A PRETRIAL DETENTION AT THIS

12   POINT.  HE'S BEEN IN CUSTODY BASICALLY A MONTH WITHOUT A

13   PRETRIAL DETENTION HEARING BECAUSE -- WE'VE TRIED TO DO IT.

14   MR. GRILLO'S BEEN IN TRIAL, AND COUNSEL -- THE DEFENDANT HAS

15   BEEN AWARE OF IT AND HAS BEEN TRYING TO HOLD AND WAIT FOR

16   HIS FAMILY TO RETAIN MR. GRILLO.  SO THAT'S WHERE WE ARE.

17           WHAT I'M GONNA DO IS I'M GONNA TAKE A BREAK.  YOU

18   TELL ME WHEN YOU'RE READY TO ARRAIGN THE DEFENDANT.  YOU CAN

19   TALK WITH MR. GRILLO, TAKE WHATEVER TIME YOU NEED.  I HAVE A

20   11:30 CIVIL HEARING.  AND IF YOU CAN DISCUSS THE INDICTMENT

21   WITH YOUR CLIENT, ENTER AN ARRAIGNMENT TODAY, GREAT.  IF FOR

22   SOME REASON YOU CANNOT, I WILL BE HAPPY TO SET IT OVER FOR

23   ARRAIGNMENT AT SOME OTHER TIME.  LET ME KNOW WHEN YOU'RE

24   READY.

25           ROOM CLERK:  ALL RISE.
```

```
1              (RECESS TAKEN.)

2              UNIDENTIFIED SPEAKER:  WE'RE BACK.  WE'RE PREPARED

3  TO GO FORWARD WITH THE ARRAIGNMENT AT THIS TIME.

4              THE COURT:  OKAY.

5              UNIDENTIFIED SPEAKER:  JUDGE, WE'LL WAIVE FORMAL

6  READING OF THE ARRAIGNMENT AND ENTER A PLEA OF NOT GUILTY,

7  DEMAND TRIAL BY JURY, AND ASK THE COURT TO SIGN THE STANDING

8  DISCOVERY ORDER.

9              THE COURT:  OKAY.  THE STANDING DISCOVERY ORDER

10 WILL BE SIGNED.  THE CASE IS SET FOR TRIAL JUNE 19TH IN

11 MIAMI IN FRONT OF JUDGE UNGARO.

12             THANK YOU.

13             UNIDENTIFIED SPEAKER:  THANK YOU.

14             UNIDENTIFIED SPEAKER:  THANK YOU.

15             (PROCEEDINGS CONCLUDED.)

16                      -  -  -  -  -

17

18                  C E R T I F I C A T E

19 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

20 THE OFFICIAL ELECTRONIC SOUND RECORDING OF PROCEEDINGS IN

21 THE ABOVE-ENTITLED MATTER.

22

23

24 _____          7/3/00
   FRANCINE C. SALOPEK, R.M.R.        DATE
25 OFFICIAL COURT REPORTER
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

NICHOLAS MARIANI,
a/k/a NICOLO MARIANI,

    Defendant.

CASE NO.: 95-8008-T/P-PAINE
MAGISTRATE JUDGE VITUNAC





## REPORT AND RECOMMENDATION

    THIS CAUSE is before the on Order of Reference from United States District Court Judge James C. Paine for the conduct of a final hearing of violation of supervised release and the filing of a report and recommendation with the respect to the same [DE 4].

    The defendant was originally sentenced by the Honorable Jacob Mishler, Eastern District of New York on October 18, 1990, for arson. The defendant was sentenced to 46 months in prison followed by three years of supervised release. The defendant is presently on supervised release. He is alleged to have violated that supervised release in 16 separate counts.

    The defendant admits Violations 1, 9, 10, 11, 12, 13, 14 and 15. The defendant pleads no contest to Violations 7 and 8. Violations 4 and 5 are dismissed in that the Government did not produce witnesses as to that violation.

    Trial was had over a two day period as to Violations 2, 3 and 6.

1



bulldozers. On August 14, 1995, at approximately 6:00 P.M., Posey was leaving the parking lot of the Bay Yacht Club at 740 S. Federal Highway where he resided. Posey was on his way to pick up his mother to go out for dinner. While attempting to drive out of the parking lot, the defendant, MARIANI, backed his Honda Accord into Posey's new 1995 Dodge Ram truck. According to Posey, MARIANI walked quickly to Posey and was very agitated. Posey backed away from MARIANI and told MARIANI to call the police. According to Posey, MARIANI was rambling and upset and agitated, particularly because Posey wanted him to call the police. MARIANI left and came back with Marcel Grasso. Grasso himself is on federal supervised release, having been convicted of conspiracy to import drugs. Grasso has known MARIANI for three years and met him at a half-way house prior to being released on supervised release.

According to Posey, at this time Grasso attempted to negotiate a settlement over the accident without calling the police. According to Posey, Marcel stated, "We're all neighbors, let's try to work this out." MARIANI then "got in Posey's face" and acted as if he were going to strike Posey. At this point, all witnesses agree that Posey stated, "If you're gonna hit me, take your best shot."

According to Posey, MARIANI acted as if he were going to walk away, then turned and "sucker-punched" him in the left side of his jaw. Posey's jaw was broken in two places and protruded through his cheek. Posey stated that MARIANI swung at him again and missed and then ran away. According to Posey, Marcel Grasso then stated, "You shouldn't have pushed him, for all you know his father could have died today."

Marcel Grasso testified that he heard Posey say "take your best shot" and then

3

Marcel turned and went back inside the condominium and did not see what happened after that.

MARIANI testified that he threw his hands up to block a punch by Posey and must have hit Posey in the jaw in self defense.

MARIANI ran from the scene and went to a friend's apartment down the road. MARIANI borrowed approximately $1,000.00 from his friend for bail money and then called the police himself and went back to the scene. After arriving back at the scene, he was arrested by the Pompano Police for aggravated battery and leaving the scene of an accident. As a result of the broken jaw, Posey spent four and a half days in the hospital and had his jaw wired shut for seven weeks. He lost one tooth and needs a root canal on another.

This Court credits the testimony of Todd Posey that NICHOLAS MARIANI intentionally struck him causing great bodily harm. MARIANI admits that he initially did not call the police as requested to do so by Posey and did not want the police called because he did not have auto insurance on his car. The fact that MARIANI fled the scene and was gone for over an hour is further evidence of his guilt. This Court finds by clear and convincing evidence that the government has proved Violations 2 and 3.

<u>Violation 6 - Impersonating a Police Officer</u>

William Cordo testified. He is an investment commodities broker with First International Group of the Palm Beaches. Cordo testified that on December 14, 1995, at approximately 9:25 P.M., he pulled in the driveway of his home at 103 Seagate Drive, Delray Beach. As he pulled in the driveway, he observed a car with its headlights off pull

<center>4</center>

out of the driveway and then upon seeing him enter the driveway, the car made a U-turn and pulled back in the driveway.

According to Cordo, the person who he now knows as NICHOLAS MARIANI, began screaming at him, "William Cordo, William Cordo, we need to speak with you. We're the FBI." The person yelled, "Stop, we're the FBI." Cordo testified that he was rattled and afraid and went into his house and closed the garage door behind him and looked out the bay window. Cordo thought perhaps this wasn't the FBI based on the behavior of MARIANI and a person who he now knows to be one Daniel Minehan. MARIANI and Minehan came up to the front door and knocked on the door. Cordo asked, "Who's there?" MARIANI responded, "Federal Bureau of Investigation. I want to talk to you about employees. We can do this the easy way or the hard way." According to Cordo, MARIANI yelled at least a half a dozen times that he was FBI. Cordo stated that if you're the FBI, show me some identification at the bay window. MARIANI refused. Cordo then watched Minehan go back to the car, get something and put it behind his back and come back to the door and start shaking the door forcefully.

At this time, Cordo's wife decided to call the police and Cordo yelled in a loud voice, "Call 911, get the police on the phone." Cordo held the phone close to the bay window so that the two men outside could see and hear him talking to the police. Cordo watched MARIANI take his thumb and finger, mimicking a cocked gun and pulled the trigger at Cordo. MARIANI and Minehan then ran to the car and left.

The police arrived at the Cordo residence shortly thereafter and arrested MARIANI and Minehan about five miles away on I-95.

Found in the car after MARIANI'S arrest were a junior deputy badge, and plastic handcuffs.

Minehan testified as to the incident at the Cordo residence, however, the defendant chose not to testify concerning this incident.

Minehan testified that he couldn't hear what MARIANI was saying at the door of the Cordo residence. He was with MARIANI because, "Nicky stopped by the gym and they went for a casual ride." He could not recall having told the police that he was actually there to "watch Nicky's back." Minehan had a less than stellar recollection of the events of that evening:

"I can't make a recollection of that to my knowledge."

"To my recollection, I didn't hear that." (As to any threats).

"It's not like I studied what was going on."

"I don't know anything about the flex-cuffs - it's not something we shared secrets about."

Minehan could not recall why he and MARIANI were at the Cordo residence. He does remember a male saying, "Call the police," at which time he walked to the car and left with MARIANI.

This Court finds by clear and convincing evidence that the defendant MARIANI impersonated an FBI agent on the evening in question and that he has committed Violation number 6.

Based on the above findings of fact, this Court RECOMMENDS to the District Court that the defendant be found guilty of Violations 2, 3 and 6, and all violations to which he

6

has previously admitted guilt, as well as Violations 7 and 8, to which the defendant has pleaded no contest.

This Court **RECOMMENDS** to the District Court that this matter be set down for sentencing before the District Court.

Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties shall serve and file written objections, if any, with the Honorable James C. Paine, United States District Court Judge within ten (10) days from the date of this report and recommendation.

**DONE AND SUBMITTED** this 27 day of January, 1997, in Chambers, West Palm Beach in the Northern Division of the Southern District of Florida.

ANN E. VITUNAC
United States Magistrate Judge

Copies Furnished To:

Howard Dargan, AUSA
Peter Birch, AFPD
J. Guthrie, USPO
Clerk of Court

7

TOTAL P.17



FILED by _SV_ D.C.

APR 1 4 1997

CARLOS JUANKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 95-8008-T/P-PAINE

UNITED STATES OF AMERICA

vs.

NICHOLAS MARIANI
TN: NICOLO MARIANI
usm# 10268-018
Soc.Sec. # 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/



GOVERNMENT
EXHIBIT
3

## JUDGMENT & COMMITMENT UPON REVOCATION OF SUPERVISED RELEASE

On April 9, 1997 defendant Nicolo Mariani was brought before the Court for a final hearing on the alleged violations of supervised release following a hearing before the Magistrate Judge on contested violations 2, 3 and 6. Present for the Government was Assistant United States Attorney Howard Dargan and present for the defendant was Assistant Federal Public Defender Peter Birch. United States Probation Officer Judith L. Guthrie was also present and participated in the hearing.

At the instant hearing the defendant gave testimony and presentations were made by the counsel for both sides. The defendant admitted violations 1, 9, 10, 11, 12, 13, 14, 15, and 16. He pled no contest to violations 7 and 8. Thereupon, it is

ORDERED AND ADJUDGED that the defendant is hereby adjudicated guilty as to violations No. 1, 9, 10, 11, 12, 13, 14, 15, and 16 and guilty as to the contested violations 2, 3 and 6. The defendant was found not guilty as to violations 7 and 8 in that the Government has not produced evidence as to those violations. Accordingly, violations 7 and 8 are hereby dismissed. Violations 4 and 5 had previously been dismissed by Magistrate Judge Ann E. Vitunac. It being further



GOVERNMENT
EXHIBIT
3



## PAGE 2 - ORDER IN CASE NO. 96-8008-T/P-PAINE

ORDERED AND ADJUDGED that pursuant to the Sentencing Reform Act of 1984, it is the Judgment of the Court hat Nicolo Mariani's supervised release is hereby revoked and the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of TWENTY-ONE (21) MONTHS. It being further

ORDERED AND ADJUDGED that the defendant shall receive credit for time served.

DONE AND ORDERED at West Palm Beach, Florida, this 14th day of April, 1997.

_____
United States District Judge

C:    Howard Dargan, AUSA
      Peter Birch, AFPD
      United States Marshal
      Judith Guthrie, USPO

```
FILE NUMBER:              245A-MM-83755

DATE OF TAPE:             OCTOBER 13, 1998

TAPE NUMBER:              1A

DAY:                      1

TYPE OF TAPE:             T-3, TELEPHONE CASSETTE

CASE AGENT/SQUAD:         DARRIN S. SACHS/OC-1

TRANSCRIBED BY:           PATRICIA VAN BRUSSELEN/HRA

DATE TYPED:               JANUARY 11, 2000


PARTICIPANTS:             MG - MARCELLO GRASSO
                          NM - NICK MARIANI
                          CL - CHRIS LAST NAME UNKNOWN

ABBREVIATIONS:            (UI) - UNINTELLIGIBLE
                          (PH) - PHONETIC
                          (IA) - INAUDIBLE
                          (SC) - SIMULTANEOUS CONVERSATION
```

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++


GOVERNMENT EXHIBIT
4

245A-MM-83755

(Non-pertinent telephone calls not transcribed)

(IA - conversations in the background)

NM: They fuck me around and jerk me around... so they say I may have to finish the rest of my time off, however much time that is now. I think it's like the week before Christmas I ex-... I expire.

MG: Jesus...

NM: So that's that...

MG: (SC) They brought you down...

NM: Did you get the message from this, from the kid?

MG: No, a mah-uh, matter of fact, the big guy said to me uh how come he don't call you? I said don't know...

NM: Once I called FENTON (PH), but there's no answer... I guess you guys were busy with the wedding up there...

MG: Yeah, I'm with, I'm with the other guy every day just about.

NM: Is he down here still?

MG: Yeah, he's gonna stay here.

NM: Alright...

MG: Uhm...

NM: I even called, I even called over there and there was no answer, would he come up for the wedding, too?

MG: Yeah, he went with me, yeah.

NM: Oh, I wasn't sure.

MG: Yeah, we all drove up.

NM: Where'd you guys stay, at the beach house?

MG: No, we wind staying at a, at a... uh they stayed at a log cabin, JOEY, CHRIS, and him... at a log cabin... right out on the lake there...

245A-MM-83755

NM:       (SC)  Uhm hm.

MG:       And ALICE and I stayed at a bed and breakfast place.

NM:       Uh huh...

MG:       Yeah.

NM:       Who else came down, just CHRIS and JOEY?

MG:       Yeah, that's it.

NM:       That's good.

MG:       That's good.

MG:       Yeah, it was a nice affair, he was happy to have us. He really had nobody there... you know...

NM:       (SC)  Those kids, where were they from, up in New York... originally?

MG:       Nah the, the one daughter was living in New York...

NM:       Up almost by Lake Ontario, right?

MG:       Yeah, and the other one was living here with uh... with her mother.

          (UI - background)

NM:       Okay.

MG:       Where are you now?

NM:       I'm, I'm, same place.

MG:       What unit?

NM:       11... 11-D.

MG:       And which the, the visiting days?

NM:       You know, I don't even know.  I really don't even know. Let me ask somebody.

NM:       Hey CHRIS... what uh... what's the visiting day here?

CL:       (UI)

3

245A-MM-83755

NM:     Three to nine on Thursday.

MG:     Thursday, three to nine...

NM:     Yeah, why?  You wanna come in?

MG:     Yeah I could, ma-matter of fact I got a nice little, little sweetness I'm gonna, I'm gonna bring ya.

NM:     Alright.

MG:     CHASTITY.

NM:     CHASTITY?

MG:     Twenty-two years old...

NM:     Yeah, but it's the phone with the fucking window.

MG:     You're kidding me?

NM:     Yeah, you might not wanna,...

MG:     (SC)  Oh, my God...

NM:     ... don't bring her for that because.... there's only one little stool there... and then she's gonna have to wait in the waiting room, you know what I mean?

MG:     Oh my God...

NM:     It's county jail style, if, you know if, if we had like, you know, a nice visit...

MG:     You're not downtown, right?

NM:     (SC)  No, I'm at the...

MG:     You'll over here in Pompano where I came with FENTON the other day?

NM:     Yeah, it's a fucking (UI), it's the, it's the (UI), the same thing as a county jail setup, it's the window with the phone.  FENTON came in, he was able to uh you know...

MG:     (SC)  Yeah I...

NM:     ... contact, you know, face-to-face...

245A-MM-83755

MG:    Yeah after he argued with the guy, he uh, you outta see
       that scene...

NM:    Yeah?

MG:    Yeah, the b-the big...

NM:    (SC)  They didn't wanna him the way he was dressed?

MG:    Oh well, the big guy was with his shorts and...

NM:    (SC)  Yeah.

MG:    ... you know...  And then when he told 'em he was a
       lawyer...

NM:    (SC)  Yeah.

MG:    ... and took out his card, whoa... how they changed.

NM:    Yeah, how they change, right?

MG:    (SC)  How...

NM:    They get scared of that.

MG:    How quick they change.

NM:    Yeah, you guys can all come Thursday if you want... but
       youze gonna have to like come in one at a time, you
       know, and see me and go.  It sucks.

MG:    Yeah.

NM:    (SC)  Yeah... that's it.  Who's CHASTITY?  Where do you
       know her from?

MG:    Yeah, it's one of ALISON's friends.

NM:    Oh, yeah?

MG:    A nice girl... (UI).

NM:    (SC)  What does she do?

MG:    She's a nurse.

NM:    Oh, no, she's not a sporca choal (PH)?

5

245A-MM-83755

MG:    Oh no, no...

NM:    Oh, she's got a job?

MG:    Yeah, a matter of fact, JUMBO wants to hook up.  He said...

NM:    Who?

MG:    JUM-uh-hum-uh... the big guy.

NM:    What do you uh, wants to hook up with who?

MG:    (SC)  And she...  She's Sicilian so... uh he thinks she'd be a nice match-up for you...

NM:    She's Sicilian?

MG:    Yeah.

NM:    A Sicilian nurse?

MG:    Uh-huh-yeah...

NM:    I don't believe it...

MG:    Yeah.

NM:    What're you hanging around a whole different caliber of women?

MG:    Yeah, things...

NM:    (Laughs)

MG:    I changed a lot...

NM:    That's good.

MG:    Yeah.

NM:    Uh at least they got a job, that means... keeps a few dollars in their pocket.  I'm not going after these deadbeats when I get out.

MG:    Yeah...

NM:    They drain ya.

6

245A-MM-83755

MG:     Now when you come home...

NM:     Yeah?

MG:     You got, you gotta have paper?

NM:     Believe it or not... in the state... whatever good time
        you earn, which I lost almost everything but two
        months... I'm gonna have until February '99...

MG:     That's your paper?

NM:     So I got like uh... if they let me out the week, I'll
        have like two month's paper... which is a joke.  It's
        one of things where... you call up once a month...

MG:     (SC)  Uhm...

NM:     ... and that's it.  It's not like the Federal pri-paper,
        you know...

MG:     Alright then this... uh this job is still waitin' here,
        you know...

NM:     If... I only needed that for the half-way house.

MG:     Yeah...

NM:     I didn't, I didn't need that, you know... to put money
        in my pocket, you know...  I only needed that to look
        good, just to get to there, but now that the half-way
        house ain't up, I'm not gonna go with that guy there...

MG:     (SC)  Man...

NM:     Uh he's just like MIRON, I only needed something just,
        just to...to...

        (Silence) (Minimized)

MG:     See, that number's changed...

NM:     How long?

MG:     Uh, maybe... two months or so.

NM:     I got this one...  3-6-2, 5-8-1-8.

MG:     No it's... 4-1-7-7-9-8-1.

7

245A-MM-83755

NM:     Hold on a minute.

        (IA - background conversations)

NM:     Say it again...

MG:     4-1-7...

NM:     Yeah.

MG:     7-9-8-1.

NM:     7-9-8-1?

MG:     Yeah...  But he's like the Fourth of July...

        (Silence) (Minimized)

MG:     Your father...

NM:     Things with my father got better.

MG:     They did?

NM:     (SC)  You know, he got older... he broke down a little
        bit...  You know, he's not the tough butcher he once
        was...  And me, I'm not so hah-quick to fly off the
        handle with him, you know?  I see an old man now, you
        know?  I almost feel sorry him...

MG:     How about Uncle MIKE?

NM:     Uncle MIKE, he's still Uncle MIKE...  He's drinking,
        he's living up state...  You know, he hunts, he fishes
        a little bit, but he does a little bit of everything...
        His two kids don't wanna know him because... he tries
        to run their lives...  The kids, they opened up a
        little store... they're doing good...

MG:     Alright...

NM:     They're trying to pull me their way, they wanna go do
        something bigger and better...

MG:     And GRACE?

NM:     Ah GRACE is still with...

        (Silence) (Minimized)

                                8

245A-MM-83755

MG:     Huh.  Huh-huh, they last a month and then they forget 'em...

NM:     Yeah, that's it.

MG:     Yeah...  yeah...

NM:     What else is going on?

MG:     Nothing...

NM:     (SC)  You hear from that little jerk-off?

MG:     Which one?

NM:     You know who... that kid there.

MG:     Oh.

NM:     Still hear from him?

MG:     Not at all.  Saw him once...

NM:     Don't hide him from me...

MG:     No, I'm serious, I saw him once.

NM:     Okay...

MG:     Yeah, I saw him once.  Saw him once... uhh... that's about it.  I haven't really haven't seen anybody at all.

NM:     Big DANNY said he's going out to Vegas.

MG:     Is he?

NM:     Yeah, DANNY (UI)  got a good opportunity out there.  Said he wants to drag the whole caravan out there, but he's got a few losers in a row this DANNY.  Went to open up PICKLES, you know he took over PICKLES...

MG:     Yeah, I heard...

NM:     They get about ten people a night in there.

MG:     Yeah, they closed...

NM:     (SC)  They ain't doing nothing.

9

245A-MM-83755

MG:    Then they're still, he did that with... what's-his-
       name...

NM:    No, you know where Baha is, right?

MG:    (SC)  (UI).  Yeah, the Theater.

NM:    Baha is paying Crockos rent.  The guy who put Crocks
       out of business is now paying the rent.

MG:    Huh.

NM:    Imagine that.

MG:    They might have uh... they might have a club, too... by
       the time you come home.

NM:    Who?

MG:    They're... the crew.  They're looking at a place in
       Hollywood.

       (Silence) (Minimized)

MG:    Oh, he was going Ocean Reef with uhh, with the big guy.

NM:    Oh, they went?

MG:    I don't know if they ever got there.  I went back to
       work after we left, and I don't know what they did that
       day.

NM:    Oh, that's good.

MG:    And then FENTON disappeared, so...

NM:    Alright.

MG:    I don't know.

NM:    Well listen, I'll see you Thursday, good talking to ya,
       I just wanted to call and let youze that I'm... not
       hittin' the street i-i-in not any day now like I
       thought I was.

MG:    Yeah, I thought you were gonna come soon, I'm by...  ..
       You know, I'm gonna bring CHASTITY with me anyway.

NM:    If you want.

                            10

245A-MM-83755

MG:     Yeah, it'd be nice conversation for you...

NM:     Alright.

MG:     You know?

NM:     I look like hell.  I'm white as a ghost.

MG:     Ah, that's to be expected.

NM:     I know.

MG:     You lost weight, I heard, too, FENTON told me.

NM:     Yeah, I did...  I dried up.  Man, amazing how fast it
        goes when you don't use it, you know?

MG:     Yeah...

NM:     No weights, no food, no diet, no nutrition, nothing.

MG:     Yeah you had, you had asked FENTON about that uh watch,
        you know...

NM:     No, he was talking about JIMMY.

MG:     Yeah that's, that's all straightened out already.  I
        already... duh-yeah... as far as right now, JIMMY owes
        me money.

NM:     JIMMY says that he put that, you put, you told him you
        put that watch up for the bondsman.

MG:     That's what I told him.

NM:     I said LENNY put my money up for the bondman.  I ain't
        got your watch, JIMMY.

MG:     No I, the, that's what I told him when I did it.

NM:     Okay.

MG:     Yeah, that's what I told him.

NM:     'Cuz he came to me... now that you're in jail, where's
        the collateral?  He's supposed to get the collateral
        back.

MG:     Yeah.

11

245A-MM-83755

NM:    And I, and, you know when...

MG:    Well that's all straightened out now, I told him...

NM:    (SC)  Okay, well anyway...  Now I asked FENTON, I didn't tell JIMMY...

MG:    Yeah.

NM:    That you gave the watch to FENTON.

MG:    Yeah.

NM:    I never said nothing, I said listen, I don't know, I don't know anything about a watch.  I never seen a watch, I told him.

MG:    Yeah.

NM:    I don't know what you're talking about...  So, when FENTON came, I asked FENTON, I said, you still got JIMMY's watch? He said, what're you talking about?

MG:    Yeah.

NM:    I said come on FENTON, I know he gave you, don't...

MG:    (SC)  He's good, ain't he?  (Chuckles)  He'll never give it up.  He didn't give it up, did he?

NM:    What?

MG:    FENTON?

NM:    No.

MG:    (Chuckles)  Yeah, he's good.

NM:    No, 'cuz I remember uh... I don't even think they met... when you sold him that watch.  They didn't even know each other then.

MG:    Probably not...

NM:    I mean it was so long ago...

MG:    Yeah, he turned out to be a real piece of shit anyway.

NM:    Well he's... hanging around with FENTON, isn't he?

12

245A-MM-83755

MG:     No, I think FENTON's gonna wind up crackin' him any day.

NM:     (Laughs)  Why?

MG:     Oh-ho-ho... 'cuz he's on his nerves...

NM:     (Soft laugh)

MG:     FENTON gives him four hundred a month... to stay there
        when he comes down here.

NM:     That's a lot, a hundred a week...

MG:     Well he may... uh maybe he stays here three, four days
        a month.  And the guy eats all the food, he-he-he... he
        abuses him.  Calls him up, let's go to lunch and never
        goes in his pocket...  You know how FENTON is, he wants
        to pay for everything, you know?

NM:     Yeah.

MG:     And the guy just abuses him to death.  The other day he
        called him up, he told him that he left the room
        dirty...  Oh-ho-ho...  You know how meticulous he is...

NM:     He called FENTON, and told him he left the room dirty?

MG:     (SC)  Y-eah...

NM:     What bedroom did he give him anyway?  What'd he do?  He
        turn the office in (UI)...

MG:     (SC)  Yeah, the middle bedroom he turned into a
        place...

NM:     Well, what was he doing in FENTON's room, anyway?

MG:     I don't know.  Uh usually he locks it, a-and you know,
        he put the bed in there, he did everything.  It's not
        that, went out even got a bed, FENTON put his own bed
        in there.  His own sheets, towels, pillowcase...  But
        that uh, you know, it's neither here nor there...

NM:     Alright.

MG:     You know, but I did a ton of things for him since...
        since then.

NM:     Who's that?

                                13

245A-MM-83755

MG:     JIMMY, jobs and accounts and...

NM:     Yeah.

MG:     Lent, you know, money...  Uh, whatever had to be done for...

NM:     (SC)  Alright, you guys are straight there.

MG:     Yeah, it's a negative situation right now, it's to the point now where he, he goes...

NM:     (SC)  Is there anybody else before I come home that you borrowed money from, and in my name, saying that you were helping me?

MG:     No and...

NM:     Nobody else that I gotta see on the street?

MG:     No, matter of fact, we gotta make a trip, me and you, to the VERSUVERO's(PH)...

NM:     Okay.

MG:     That's for personal... and straight that out.  'Cuz I went there with ALISON one night and I grabbed him in the bar, he denied the whole friggin' thing.  Now, he hadda say somethin'... 'cuz uh when it got to where it got... with that guy, for him to say, he didn't pass stupid remarks...  I wanna get that straightened, that's one of things I wanna straighten out right away.

NM:     Well, if it's straight, it's straight.  No sense, you know, stirring it up.  But if, if needs to be still straightened out...

MG:     (SC)  Yeah, but...

NM:     If it still uh, if, if there's, if there's still doubt there, then it has to be straightened out.

MG:     Well th-the...

NM:     And if you're telling me you went there with they guy, you... youze talked and... everything is straight, I mean what do we go back for and, and (UI).

MG:     (SC)  Well... for your own sake, because every time I

14

245A-MM-83755

|     |     |
|-----|-----|
|     | see them they... |
| NM: | All I wanna know is if somebody stops me in the street, I'm gonna be pissed off if they where's my money 'cuz I helped you, blah blah blah... |
| MG: | Naw, you're not gonna find that. |
| NM: | Okay. |
| MG: | (UI). |
| NM: | If there is, just take care of it before I come home. |
| MG: | Yeah, no, I would tell you.  There's not, there's not, not a per-it's not, it's not, it's not an issue, it'll never be an issue. |
| NM: | (SC) You're say you're making money, there's no reason why... if you did go borrow money at the time you needed it... and I wasn't around, they couldn't check if it was true or not... and you used it and you want it... now's a good time to pay them back, 'cuz you are making money. |
| MG: | Nah, the only thing that, that was, was... that watch. That was it. |
| NM: | (SC)  Alright. |
| MG: | That was the only thing.  You know... |
| NM: | That's the scoop... |
| MG: | Alright. |
| NM: | Everything else is... is copacetic.  Can't change my situation but... time is the only thing that's gonna change it. |
| MG: | Well, you sound good. |
| NM: | Yeah, I'm alright.  My family's been real supportive the whole time.  Really.  Really, we got close on this one, you know? |
| MG: | Well, that's good. |
| NM: | 'Cuz they realized it wasn't my fault...  Whereas, you |

15

245A-MM-83755

> know, before I was younger, I was... you know I, I
> deliberately did the fire, you know...  I didn't have
> to do what I did, and they kinda like resented that a
> little bit.  But now, my father, he can't do enough for
> me.  Really.

MG:     There you go.

NM:     I mean, everywhere I went, he came...  You know, he's
        not working, he's retired now and...  You know, he's...
        lookin' to throw me a few dollars at the time and I
        didn't need it... but he was offering and he never did
        that before.

MG:     Hm.

NM:     Yeah, he changed.  He softened up.

MG:     Now he's gettin' old, he knows he's gonna some day, you
        know he's... trying to get clo-that's good, though.

NM:     Yeah, everything is...

MG:     (SC)  Whatever it takes, it doesn't make a difference,
        you know...

NM:     Yep.

MG:     (SC)  (UI).

NM:     I can't blame him for the way he thinks, he's an old...
        you know what he, you know where he comes from.

MG:     Yeah.

NM:     He comes from overseas, they got a different... outlook
        on life.  Everything we do is wrong... because... they
        think we have too much and we don't appreciate it.

MG:     (UI)...

NM:     (SC)  How's your mother, okay?

MG:     Yeah, my mother's fine...

NM:     Healthy?

MG:     Yeah, good.

16

245A-MM-83755

NM:     (SC)  That one up in Jupiter, you ever make amends with her?

MG:     Yeah, yeah.

NM:     You did?

MG:     Yeah, I straightened it all out.

NM:     And the husband?

MG:     I don't but, yeah, he acts, hello, good-bye, you know, a friendly uhh...

NM:     That's it?

MG:     Yeah, I dropped, I, I gave up a lot there to make that work.

NM:     You did?

MG:     Yeah, why not?  My mother asked me and I...

        (Silence)

NM:     I'm locked up.

MG:     See, no, you better not, you son-of-a-bitch.

NM:     (Laughs)

MG:     I, I, I hope that you ch-that everything changes and you got a little different attitude...

NM:     Ah, we'll see.

MG:     You know?  I really do.

NM:     We'll see.  There's still a few uhh...

MG:     I know, I know you...

NM:     (SC)  There's still a few people that need some wacks.

MG:     I know, it's see... y-y-you can't change the uh, a leopard's spots but...

NM:     Yeah uh.

17

245A-MM-83755

MG:      You can make 'em smarter... you know?

NM:      (SC)  Alright.

MG:      But I...

NM:      (SC)  With that, I'll say good-bye to you.

MG:      Yeah, I'll see you Thursday.

NM:      (SC)  It's been nice talking to ya, if ya wanna bring anybody down, I'm here three to nine.

MG:      Yeah, it's Thursdays three to nine.

NM:      Okay.

MG:      Alright, I'll talk to ya later.

         (End of telephone call)

         (END OF TAPE)